**James T. VOUTOUR,**
**Plaintiff, Appellee,**

v.

**Harold VITALE, et al.,**
**Defendants, Appellants.**

**James T. VOUTOUR,**
**Plaintiff, Appellant,**

v.

**Harold VITALE, et al.,**
**Defendants, Appellees.**

Nos. 84–1159, 84–1214.

United States Court of Appeals,
First Circuit.

Argued Aug. 7, 1984.

Decided March 29, 1985.

As Amended May 8, 1985.

Rehearing Denied May 8, 1985.

Rehearing En Banc Denied May 9, 1985.

Bownes, Circuit Judge, filed concurring opinion.

Richard L. Neumeier, Boston, Mass., with whom James F. Meehan, Cheri L. Crow and Parker, Coulter, Daley & White, Boston, Mass., were on brief for James T. Voutour.

Alan Garber, Boston, Mass., with whom Philip A. Mason and Mason & Martin, Boston, Mass., were on brief for Harold Vitale.

Gael Mahony, Boston, Mass., with whom Michael S. Greco, Robert G. Dreher and Hill & Barlow, Boston, Mass., were on brief for Town of Saugus and Fred Forni.

Richard M. Magnan, Andover, Mass., with whom George O. Gregson, Saugus, Mass., was on brief for Howard Wheeler.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

PER CURIAM.

This appeal is from the judgment entered in a section 1983 civil rights action and pendent state tort claim arising out of the shooting of plaintiff James T. Voutour by a Saugus police officer, defendant Harold Vitale. We start with a capsulated account of the circumstances leading to the shooting.

THE FACTS

Voutour and two companions, Dennis MacDonald and Lawrence Dionne, spent the night of Sunday, February 13, 1977, and early Monday morning driving around in an automobile just acquired that after-noon by Voutour. The car was in poor condition; the tires were bad, the brakes did not operate properly, and one headlight was burned out. The car was neither registered nor insured. Sometime early Monday morning, Voutour drove to the parking lot of Gibbs Ford. When he got there, he noticed a police cruiser. The cruiser was manned by Vitale and a subordinate, defendant Howard Wheeler. Vitale and Wheeler were looking for a vehicle that had been involved in an automobile accident earlier that night.

There are two different versions of what happened at the Ford lot. Wheeler's version is that he noticed the Voutour vehicle and started towards it on foot when it suddenly accelerated, turned around, passed him, proceeded the wrong way for a time on an exit ramp off Route 1 and then drove away. As the car started to accelerate, Wheeler shouted "stop" and noted its license plate number ·as it went by him. Voutour testified that, because of the condition of his car, he did not want any problems with the police, so when he saw the cruiser he turned around, left the parking lot, went the wrong way for a short distance on the exit ramp, and then proceeded on his way. He was not aware that the police had seen the car and heard no command to stop.

Voutour's intention was to drop MacDonald off near his home. In order to avoid the police, he took an indirect route. Before he got to MacDonald's drop-off corner, Voutour stopped the car temporarily so MacDonald's tape deck could be detached from the dash. He pulled over to the side of the road, kept the engine running and put the gear shift lever in the park position. A short time later, Vitale and Wheeler, who were looking for the Voutour vehicle, passed the parked car, backed up and stopped the cruiser about a car's length behind the Voutour vehicle. After determining that the car was the same one that they had seen at the Gibbs Ford lot, it was decided that Wheeler would question the occupants. The cruiser did not have its flashing blue lights on, nor was the siren used. Wheeler left the cruiser without wearing his police hat. There is a dispute as to whether Wheeler had both a gun and a flashlight in his hands as he approached the car or just a flashlight. When Wheeler

* Of the District of Puerto Rico, sitting by designation.

got to the door on the passenger's side of the car, Voutour started to accelerate. The car skidded slightly, grazing Wheeler who grabbed the door handle and continued to hang onto it as the car moved forwards.

Again, there are two versions of what happened next. Voutour says that as soon as he realized Wheeler was a policeman, he started to slow down, opened the door, put his left foot out and was starting to put the car in park when he was shot. Vitale testified that he got out of the cruiser, saw the Voutour vehicle start up with Wheeler being dragged down the road. He yelled for the car to stop, but it did not slow down. He then decided that in order to save the life of his partner, he had to stop the car by shooting the driver. He drew his revolver and fired at the driver's shoulder. There is no dispute that the shot hit Voutour in the neck rendering him a permanent quadriplegic.

## PROCEDURAL HISTORY

Voutour sued both Vitale and Wheeler under 42 U.S.C. § 1983 and also filed a pendent assault and battery claim against Vitale under Massachusetts law. He brought a section 1983 action against the Town Chief of Police at the time of the shooting, Fred Forni, and against the Town of Saugus.[1] Over a year before the trial, the district court allowed motions for summary judgment filed by Wheeler, Forni, and the Town on all claims against them. The jury returned a verdict which, in effect, found Vitale not liable on the section 1983 count, but liable on the state assault and battery count; it awarded Voutour damages against Vitale in the amount of $1,100,000. Both Voutour and Vitale have appealed.

## VITALE JURY VERDICT

The jury found Officer Vitale not liable to Voutour under section 1983 but liable for assault and battery under the law of Massachusetts. Both plaintiff and defendant seek to have this verdict overturned on the ground that written questions submitted by the jury to the district judge after the case had gone to the jury, and the judge's written responses thereto, were not disclosed to counsel until after the verdict.

At the close of the trial, the court put three special questions to the jury. Question # 1, which was to be answered "yes" or "no," was whether defendant Vitale had shot plaintiff under circumstances in which the use of deadly force was so unreasonable as to violate plaintiff's constitutional rights. Question # 2, which was to be answered in a similar way, was whether defendant Vitale had been justified under state law in using deadly force against plaintiff. Question # 3, which had three parts, concerned the amount of damages to be awarded to compensate plaintiff for his injuries, for the violation of his constitutional rights, and for other punitive damages.

During its deliberations, the jury sent the district judge the following note:

Your Honor:
    If the answer to question # 1 is—no + the answer to question # 2 is—yes—may—we turn to page two + fill in any dollar amount.

The district court did not notify counsel of this inquiry, but instead sent the following written response:

Members of the Jury:
    You must answer question 3 only if the answer to Question 1 is yes and/or the answer to Question 2 is no.

Thereafter, the jury sent another note to the judge which read:

Your Honor:
    This may be a funny question, But is there any way question # 2 can be worded different. We feel that officer Vitale had a right to shoot to protect his partner, but Jimmy Vouture (sic) did not know he was endangering an officer's life, so he was also some-what not wrong.

Again, without notifying counsel the judge responded in writing:

Members of the Jury:
    I cannot word Question 2 in any other way. It asks you to answer the only question which is legally relevant concerning Mr. Voutour's claim under state law. That question concerns Mr. Vitale's conduct and, particularly, whether he was "justified" in shooting Mr. Voutour, as I had explained that term.

---

**1.** Voutour also filed a state assault and battery claim against Wheeler and state negligence claims against all defendants. These claims seem to have been abandoned during the course of the litigation and have not been raised by any of the parties on appeal. Accordingly we do not address them.

The jury then sent the judge a written note asking:

Your Honor:

I hate bothering you again. But could you please write me a definition of Justification + also write to me briefly the State Law relative to # 2.

Thank you.

At this point, the judge contacted counsel for the first time. She told them that she had received the latter note and read it to them. She also informed them that there had been earlier questions from the jury which she had not disclosed to counsel because some of these were "too suggestive of what the jury was doing." The judge did not show the earlier notes to counsel but promised that she would do so after the jury had rendered its verdict and that she would allow any objections at that time. The jury was then brought in and the judge issued supplementary instructions on the state law claim.

Thereafter, the jury returned a split verdict, finding for the defendant Vitale on the section 1983 claim, but for the plaintiff Voutour on the state assault and battery claim. The court, as it had promised, later revealed all of the earlier questions it had received from the jury and its responses. Vitale filed a motion for judgment n.o.v. or new trial, claiming that he had been prejudiced by the district court's secret instructions. The district court denied the motion.

On appeal Vitale renews his argument claiming that the district court's failure to notify counsel of the content of the jury's earlier requests was prejudicial and deprived him of the opportunity to prevent what he characterizes as a compromise verdict. He is joined by plaintiff who also claims that he was prejudiced by the district court's secret instructions to the jury. Both parties seek a new trial as to all counts.[2]

We are guided here by the Supreme Court's holding in *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919), that "written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object." *Id.* at 81, 39 S.Ct. at 436. As the Court pointed out:

It is not correct ... to regard the opportunity of afterwards excepting to the instruction and to the manner of giving it as equivalent to an opportunity to be present during the proceedings. To so hold would be to overlook the primary and essential function of an exception, which is to direct the mind of the trial judge to the point in which it is supposed that he erred in law, so that he may reconsider it and change his ruling if convinced of error, and that injustice and mistrials due to inadvertent errors may be thus obviated.

*Id.* at 82, 39 S.Ct. at 436. The Court also held that secret instructions which incorrectly state the law are "presumptively injurious." *Id.* Other Supreme Court decisions have made clear that even when the secret communication does not misstate the law, a new trial may be warranted if it has affected the outcome by subtly influencing the jury. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 460–61, 98 S.Ct. 2864, 2885–86, 57 L.Ed.2d 854 (1978); *Rogers v. United States*, 422 U.S. 35, 38–40, 95 S.Ct. 2091, 2094–2095, 45 L.Ed.2d 1 (1975). *See also Vogel v. American Warranty Home Service Corp.*, 695 F.2d 877, 881 (5th Cir.1983); *United States*

---

**2.** Originally Voutour requested only a partial new trial with respect to the section 1983 count on which he was unsuccessful. However, at oral argument, counsel conceded in response to questions put to him that a new trial would be proper as to everything. The exchange was the following:

JUDGE BOWNES: Why shouldn't there be a trial on everything?

COUNSEL: Well, Your Honor, quite frankly, I've been persuaded that probably the better rule, although we argued for a different result here, is that there should be a new trial on everything. We do suggest a way to rationalize having a new trial only on the federal count, but on reading the reply brief filed by Vitale, we realize that we have very much an uphill battle on that, given the way the Supreme Court has construed Rule 59. But I would prefer a new trial on both counts, as opposed to affirmance as to what happened in the district court.

JUDGE BOWNES: Well, what are you fighting about? Everybody wants a new trial.

COUNSEL: ... Both sides emphasize that the district court made a mistake in giving secret instructions to the jury without consulting with counsel.

JUDGE BOWNES: ... Now, it would appear that you and Vitale agree that there ought to be a new trial.

COUNSEL: We agree on that.

JUDGE BOWNES: So the only issue as far as you are concerned is whether or not summary judgment was correct as to Wheeler and the Town.

*v. Burns,* 683 F.2d 1056, 1058–59 (7th Cir. 1982), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983); *Krische v. Smith,* 662 F.2d 177, 179 (2d Cir.1981); *Petrycki v. Youngstown & Northern Railroad Co.,* 531 F.2d 1363, 1366–67 (6th Cir. 1976).

In *United States v. Flaherty,* 668 F.2d 566 (1st Cir.1981), we held that, although subject to the harmless error rule, secret communications between the judge and the jury create a presumption of prejudice and that the other party has "a heavy burden ... to show that no prejudice resulted." *Id.* at 602.

■ Here the notes sent to the judge by the jury suggest that the jury thought that neither Vitale nor Voutour were wholly at fault and that the jurors didn't quite know how to articulate this in their verdict. In the circumstances, had counsel been informed of the notes and received an opportunity to comment, it is at least conceivable that the court would have framed its instructions differently and that a different outcome could have resulted. To be sure, the court's answers contained no misstatement of the law; and had the opposing party not conceded prejudice we might hesitate to reverse notwithstanding the court's error. Given, however, both Voutour's and Vitale's insistence that the incident was prejudicial, the desire of each of them for a new trial on these claims, and the fact that a trial must be had with respect to other related claims, we vacate and order a new trial with respect to so much of the judgment as both dismissed Voutour's section 1983 count against Vitale and awarded to Voutour the sum of $1,100,000 against Vitale on the state law assault and battery count.

## SUMMARY JUDGMENT

■ The district court did not permit Voutour's claims against Officer Wheeler, Chief of Police Forni, and the Town of Saugus to go to trial. Instead, it entered summary judgments in favor of Officer Wheeler, Chief of Police Forni, and the Town of Saugus more than a year prior to the trial. Voutour now challenges the court's granting of summary judgment on these claims. Our review is confined to an examination of the materials before the court at the time the rulings were made. Neither the evidence offered subsequently

at the trial nor the verdict is relevant. Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Our standard of review is well established:

> In determining whether summary judgment is appropriate, we must "look at the record ... in the light most favorable to ... the party opposing the motion," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), indulging in all inferences favorable to this party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir.1982); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Reversal of a grant of summary judgment is required when issues of fact which were adequately raised before the district court need to be resolved before the legal issues in the case may be decided. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Over The Road Drivers, Inc., v. Transport Insurance Co.,* 637 F.2d 816, 818 (1st Cir.1980).

*Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983).

It is against this rigorous standard that we proceed to examine the court's dismissal of the claims against Wheeler, the Chief, and the Town.

### Officer Wheeler

■ We consider first the grant of summary judgment in favor of Officer Wheeler on Voutour's section 1983 claim against him. Voutour sought to hold Vitale's partner, Wheeler, liable under section 1983 on the theory that Wheeler's approach to plaintiff without sufficiently identifying himself as a police officer was foreseeably linked to Vitale's later conduct in shooting Voutour. While it was Vitale's, not Wheeler's, conduct that allegedly deprived Voutour of "rights, privileges, or immunities

secured by the Constitution and laws," in purported violation of section 1983,[3] Wheeler is said to share responsibility for the ultimate act of violence because of his initiation of a chain of events which caused Vitale to shoot in defense of Wheeler. In rejecting this theory, the district court found that "while Wheeler's actions might be viewed as having proximately caused plaintiff's injury, as a matter of law the affidavits do not support the conclusion that Wheeler's acts were so careless and reckless as to show the utter indifference to resulting consequences upon which a finding of gross negligence can be predicated."

■ On appeal, plaintiff challenges the use of a gross negligence standard as to Wheeler. He claims that simple negligence, not gross negligence, is the appropriate standard for a section 1983 claim for deprivation of liberty without due process of law in violation of the fourteenth amendment. The determination whether simple

or gross negligence applies, and its implications for this case, are shrouded in the mists that presently envelop this area of the law.[4] But, acting by such lights as are available, we do not believe that an actor as remote from the primary civil rights violation as Wheeler is be held liable under section 1983.

Wheeler raised a good faith immunity defense under section 1983, and we have recognized the applicability of such a defense in cases of this nature. *See Connors v. McNulty*, 697 F.2d 18, 21 (1st Cir.1983); *DeVasto v. Faherty*, 658 F.2d 859, 865 (1st Cir.1981). *See also Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court set out the standard to be applied, holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

3. This circuit has recognized that the use of excessive or unreasonable force or violence by law enforcement personnel resulting in personal injury deprives a person of liberty without due process of law in violation of the fourteenth amendment. *Landrigan v. City of Warwick*, 628 F.2d 736, 741–42 (1st Cir.1980). *See also Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981); *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

4. In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court held that the *negligent* taking of a prisoner's *property* as a result of a random and unauthorized act by a state employee acting under color of law amounted to a deprivation of property within the context of the fourteenth amendment. *Id.* at 536–37, 101 S.Ct. at 1913–14. The Court went on to hold, however, that such a deprivation is not without due process of law (and hence not actionable under section 1983) when the state provides a post-deprivation tort remedy under which the respondent can obtain compensation for his loss. *Id.* at 541, 101 S.Ct. at 1916. This holding has been subsequently extended to *intentional* deprivation of property. *See Hudson v. Palmer*, — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

It is yet unclear whether this approach will be applied to deprivations of life or liberty under the fourteenth amendment. *See* Note, *Due Process Application of the Parratt Doctrine to Random and Unauthorized Deprivations of Life and Liberty*, 52 Fordham L.Rev. 887 (1984) (arguing that the doctrine should be so applied); Note,

*Parratt v. Taylor: Don't Make a Federal Case Out of It*, 63 B.U.L.Rev. 1187 (1983) (same); *compare with* Note, *Defining the Parameters of Section 1983: Parratt v. Taylor*, 23 B.C.L.Rev. 1218 (1982) (taking the opposite view). *See also* R.A. Smolla, *The Displacement of Federal Due Process Claims by State Tort Remedies: Parratt v. Taylor and Logan v. Zimmerman Brush Company*, U.Ill.L.F. 831 (1982). Some courts have begun to do so, *see, e.g., Thibodeaux v. Bordelon*, 740 F.2d 329 (5th Cir.1984), *cf. Augustine v. Doe*, 740 F.2d 322 (5th Cir.1984) (holding that *Parratt* is limited to procedural due process violations), even in cases such as the present involving use of excessive force in an attempted arrest. *See Gilmere v. City of Atlanta*, 737 F.2d 894 (11th Cir.), *reh. granted*, 737 F.2d 912 (1984).

Plaintiff has relied on *Parratt* to argue that *negligence* provides a basis of recovery under section 1983. But we cannot apply that aspect of *Parratt* without also looking into *Parratt*'s primary teaching, *i.e.*, asking whether the existence of an adequate state negligence remedy affords sufficient process to vitiate any section 1983 claim here. A case can be made for such a result, bearing in mind that Wheeler himself committed no violence against Voutour, being linked to the shooting solely by alleged negligence. If section 1983 is to be reserved for violations of civil rights as commonly understood, it might be reasonable to hold that although Vitale's use of excessive force, if proven, violated section 1983, Wheeler's unwitting negligence did not.

Since, however, Wheeler raised a good faith immunity defense and we are deciding the issue on that ground, we do not attempt to resolve the partial or total applicability of *Parratt* here.

constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Under this standard we believe the district court was correct in entering summary judgment for Wheeler.

Judging the facts in the light most favorable to plaintiff, the record before the district court showed that on the night of the shooting Wheeler had stealthily approached the Voutour vehicle without prior warning, not wearing his uniform hat and with a drawn gun in his hand. These facts, while arguably capable of sustaining a jury finding of negligence or even gross negligence, could not, we think, support the conclusion that the particular constitutional violation (*i.e.*, the shooting of Voutour by Wheeler's partner in violation of Voutour's civil rights) was a result which a reasonable person in Wheeler's position "would have known."

To be sure, a reasonable person in Wheeler's shoes might arguably have surmised that some sort of chaotic situation would arise from the arrestee's failure to realize he was being approached by police. But this is different from saying that a reasonable man in Wheeler's position would have known as he was approaching Voutour's car in the way described that Vitale would eventually use excessive force against Voutour—and it was Vitale's use of excessive force that is the constitutional violation Wheeler would have to have "known" would occur. The Supreme Court has admonished that the fourteenth amendment should not be turned into "a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). We affirm the district court's grant of summary judgment with respect to the section 1983 claim against Officer Wheeler.

### Chief of Police

The court also granted summary judgment, based on such materials as were then before it, on Voutour's claims against the Chief of Police and the Town of Saugus. With respect to the Chief of Police, the complaint makes these allegations: that the Chief "condoned, encouraged, and acquiesced in defendant Vitale's prior use of excessive force and characterized such conduct as part of defendant Vitale's duties" and that the Chief had a duty to undertake "reasonably adequate procedures in the selection, assignment and training of police officers to prevent said officers from misusing firearms and from committing unlawful acts of violence" and "if any selection, assignment and training was done it was undertaken in a reckless and grossly negligent manner," all or any of which, it was alleged, proximately caused the shooting of Voutour. We construe this somewhat ambiguous language to allege a failure to train the Town's police officers properly in the use of firearms and also that it was a custom of the police department to use excessive force.

As the action against the Chief is based solely on section 1983, our initial inquiry is "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). There can be no doubt that the first of these requirements was met; the conduct in question was committed by a chief of police acting in his official capacity. The second requirement contains two distinct elements. To begin with, there must have been a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States. Here the deprivation would consist of Vitale's alleged use of excessive force in shooting Voutour. *See* note 3, *supra.* The harder question is whether the Police Chief's conduct can be said to have caused this deprivation, so as to make the Chief liable under section 1983. The Supreme Court has firmly rejected *respondeat superior* as a basis for section 1983 liability of supervisory officials, *Monell v. Department of Social Services*, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976)), or municipalities, *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. The Court has said that the language in section 1983, "subjects, or causes to be subjected," should not be construed to include vicarious liability, which is based on considerations of public policy rather than fault or causation. Nonetheless, lower courts have suggested that the statutory language is broad enough to extend liability to those not personally involved in the deprivation of constitutional rights. *McClelland v. Facteau*, 610 F.2d 693, 696

(10th Cir.1979). Such situations are limited, however, to ones showing an "affirmative link" between the conduct of the supervisor and that of the employee. *Rizzo,* 423 U.S. at 371, 96 S.Ct. at 604.

In the case at hand, the plaintiff has advanced two theories linking the Police Chief's conduct to the shooting of Voutour by Officer Vitale: the Police Chief is charged with having established a policy or custom of using excessive force and the Chief did not properly train police officers in the use of firearms.

■ We agree with the district court that "[p]laintiff has adduced no evidence to show a pattern of violent police behavior which might support an inference that the Chief of Police supported or acquiesced in such behavior." Even if we were to credit complaints of police brutality as well as complaints of other shootings, we cannot see that they form a pattern of police violence so striking as to allow an inference of supervisory encouragement, condonation, or even acquiescence.[5] *Cf. Herrera v. Valentine,* 653 F.2d 1220, 1225 (8th Cir.1981) (in addition to proving 40 separate incidents of police misconduct, plaintiffs showed that these incidents had been brought to the attention of supervisory officials).

The claim of lack of police training in the use of firearms or training that was undertaken in an inadequate manner is, however, a different matter. In its opinion granting the Chief's motion for summary judgment, the district court held that under section 1983 *gross* negligence would have to be shown before liability would attach. The court went on to find that it might be possible for a jury to find gross negligence on the part of both the Police Chief and the Town for their failure to train Officer Vitale, but that nonetheless "summary judgment for these defendants is still warranted because the affidavits in no way support the inference that such negligence was the 'moving force' behind or even a proximate cause of plaintiff's injury," (citing *Polk*

*County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)).

■ We agree with the district court that a section 1983 claim based on lack of proper police training requires, at very least, proof of gross negligence both as to the Police Chief and the Town.

We have found no case holding squarely that simple negligence by a police chief in training subordinate police officers is sufficient to anchor section 1983 municipal liability. In the light of *Monell*'s requirement that official policy must be "the moving force of the constitutional violation," 436 U.S. at 694, 98 S.Ct. at 2038, and the holding of *Rizzo* that a general allegation of administrative negligence fails to state a constitutional claim under section 1983, 423 U.S. at 370–377, 96 S.Ct. at 603–607, we believe that significantly more than simple negligence in police training is necessary for municipal liability under section 1983. Like most other courts that have addressed the matter, we hold that the supervisor must demonstrate at least gross negligence amounting to deliberate indifference, and that this conduct must be causally linked to the subordinate's violation of plaintiff's civil rights. *See Languirand v. Hayden,* 717 F.2d 220, 227 (5th Cir.1983) ("failure to train must constitute gross negligence amounting to conscious indifference"); *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982) (municipal liability only where there is a complete failure to train or training is so reckless or grossly negligent that future police misconduct is almost inevitable); *Herrera v. Valentine,* 653 F.2d at 1224 (failure to train or grossly negligent training); *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.1979) (gross negligence or "deliberate indifference"); *Leite v. City of Providence,* 463 F.Supp. 585, 591 (D.R.I. 1978) (simple negligence not enough, "training must be nonexistent or reckless, or grossly, palpably, and culpably neglected").

---

**5.** Plaintiff, in his brief, makes much of an incident involving Officer Vitale which occurred on January 10, 1976, at the Hilltop Steak House restaurant. It was alleged that Officer Vitale, who was on duty with another police officer, pushed a patron against the wall, put handcuffs on him and took him into custody without justification. The patron was released within a short time and rejoined his party. After learning of the incident, the Chief obtained reports from the officers present and, on the basis of their reports, Vitale was exonerated. A civil suit subsequently brought against the Town by the aggrieved patron was settled. Distressing as Vitale's conduct might have been on this occasion, this isolated incident cannot form the predicate for the customary use of excess force by the Saugus Police Department. *Landrigan v. City of Warwick,* 628 F.2d 736, 746 (1st Cir. 1980).

When ruling on the motion for summary judgment, the district court concluded that the record contained sufficient facts from which a jury could have found gross negligence on the part of both the Police Chief and the Town. We agree with this conclusion, for reasons mentioned below. The district court went on to say, however, that the record did not admit of an inference that such gross negligence was the proximate cause of plaintiff's injury. With this latter point we disagree. After reviewing the record that was then before the court in the light most favorable to the plaintiff, we conclude that there was a genuine issue of material fact concerning whether the alleged failure to properly train Officers Vitale and Wheeler was the proximate cause of Vitale's alleged use of excessive force against Voutour.

With respect to proof of gross negligence, this case is distinguishable from many others in that the materials before the court indicated that the Police Chief had violated state law by failing to provide Vitale with required police training.

At the time of the facts Massachusetts law required

> *Every person* who receives an appointment as a regular police officer on a permanent full-time basis in any city or in any town, ... *shall, within nine months of the date of his appointment,* be assigned to and shall attend a police training school approved by the Massachusetts police training council for a course of study lasting at least six weeks and shall satisfactorily complete such course. . . .

1972 Mass.Acts, ch. 697 (emphasis added). The statute further provided that "every regular police officer on a permanent full-time basis in any such city or town, ... shall be assigned to and shall attend a police training school approved by the Massachusetts police training council for the purpose of completing an approved course of study of in-service training at such intervals and for such periods of time as the council may determine." *Id.* It appears that, in direct violation of this statute, Officer Vitale never attended a police training school until after the Voutour shooting, a period of almost five years from the date of his appointment as a full-time police officer on the Saugus Police Department. The reason given by the Chief for the failure to follow the statute was that Vitale had received firearms training in the Army and police training as a reserve officer on the Revere Police Department. The statute itself, however, is mandatory in its terms, containing no exceptions. The extent of Vitale's training as a reserve officer was not documented, but the statute applies to full-time police officers, not reserves, and there is no evidence that Vitale attended an approved police training school prior to the shooting. Nor, given the difference in missions between the military and the police, is it clear that Vitale's Army training would be a satisfactory substitute for the statutory requirements. According to his deposition, Vitale's firearms training in the Army was confined to the M 1 and M 14—both rifles. There is no mention of handgun training. Moreover, it seems likely that police training, in addition to teaching proficiency in the use of handguns, would include training as to the circumstances in which a police officer should not shoot.

Both the Chief and Vitale testified that Vitale had received other in-service training with respect to the use of firearms. According to their testimony, this consisted of short sessions held before roll call and of occasional target practice. This was also the type of training received by Wheeler. Viewing the record in the light most favorable to plaintiff, we conclude that there was an issue of fact as to the effectiveness of the in-service training provided by Saugus to its police force. James J. Fyfe, a putative expert witness for plaintiff in police training and procedure, testified that the in-service firearms training was inadequate at this time, because it was limited to the mechanics of firearms use and han-

dling, "approaching the arrested," and to target practice. He concluded that "[t]he failure of the Saugus Police Department to provide Officers Vitale and Wheeler with *job relevant* in-service training was reckless, violative of generally accepted police practice, and a direct cause of the reckless and unjustifiable shooting of Mr. Voutour." (Emphasis added.) Also, Chief Forni had previously stated in a proposal for the reorganization of the Saugus Police Department that it was his opinion that "in-service training at roll call for 30 minutes is not adequate or effective."

The Chief testified in answers to interrogatories that neither Vitale nor Wheeler received any training in the use of firearms. Vitale's testimony was that he owned a .38 Smith and Wesson revolver and that he trained himself in the use of it.

In the record before the district court was a letter from one of the Chief's subordinates detailing three separate incidents of the unjustified use of service revolvers by members of the Saugus Police Department.[6] The letter which was written six months prior to the Voutour shooting, contains the following:

> How does one compensate for the lost [*sic*] of a life or limb? It appears that the 1:00 a.m. to 9:00 a.m. early morning division are not getting any competent men (only bodies), as this is the third shooting on division in question with three separate officers on three separate occasions. One of the shooting [*sic*] involved a defendant being shot in the abdomen requiring hospitalization.
>
> It also appears that efforts are becoming futile when it comes to training some officers ragarding [*sic*] the use and handling of their service revolver. Several officers that I have spoken to fear for their safety as well as the public safety when we employ men such as Officer [name deleted]. I would not like to see

this department learn through trial and error after a life or limb has been taken.

■ We think the foregoing indicated a triable issue concerning whether or not the Police Chief had been grossly negligent to the point of conscious indifference with respect to police training, and in particular Vitale's training.[7] Whether the record also reflected a causal connection between the lack of training and Vitale's actions is perhaps closer, but we believe it did. Viewing the facts in a light most favorable to plaintiff, it could be inferred that the arrest culminating in Vitale's shooting of Voutour, and the shooting itself, were so mishandled in their various details as to indicate that trained officers would not have acted in this manner.

■ Also relevant to the issue of causation was the affidavit of plaintiff's expert, James F. Fyfe, stating, among other things, that the shooting of Voutour was a highly predictable result of the inadequate training received by the Town police officers and particularly Vitale's lack of basic police training. The Fyfe affidavit, if admissible under Fed.R.Civ.P. 56(e), obviously provides additional support for causation. But we need not consider the question of its admissibility since, even without it, we think there was enough evidence from which causation might reasonably be inferred to make summary judgment inappropriate.

Thus viewing the facts in the light most favorable to plaintiff, we think the district court erred in granting summary judgment for the Chief on the issue of adequate police training. At trial, of course, the district court will have the usual opportunity to review the legal sufficiency of the evidence Voutour actually submits. By then, especially after examination and cross-examination of witnesses, *see* C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2532 (1971), the evi-

---

**6.** None of these involved Vitale.

**7.** Like Wheeler, Chief Forni raised a qualified good faith immunity defense against Voutour's section 1983 claim. Unlike Wheeler's situation, however, we believe that a wrongful shooting

would be the type of result that would be likely to arise—and hence be "known" under *Harlow* —from a failure to train police officers in the proper use of weapons.

dence as to the training received and the Chief's knowledge and responsibility will be more fully delineated. We hold only that under standards applicable to a motion for summary judgment, Voutour was entitled to proceed to trial on this matter. The court, therefore, erred in granting summary judgment against the Police Chief on Voutour's section 1983 claim.

### Town of Saugus

Since we have sustained the district court's grant of summary judgment to the Police Chief on the part of the claim that he established or permitted a custom of excessive police violence, we also affirm, for the same reasons, the summary judgment for the Town on that part.

■ With respect to the adequacy of the training given to the defendant officers, much of the same reasoning that caused us to vacate the granting of summary judgment against the Chief leads us to vacate the grant of summary judgment for the Town of Saugus. This does not mean, however, that the Town would be automatically liable if there were a finding that the Chief's failure to properly train Vitale and, to any extent relevant, Wheeler, rose to the standard of gross negligence amounting to conscious indifference. The evidence may demonstrate that the Town was not aware of the Chief's derelictions, assuming these are proven. The Town Manager, in answer to pretrial interrogatories, stated that the Town followed the statutory mandate for police training as a matter of policy. There is nothing in the record to indicate whether the Town knew of the Chief's statutory disregard in Vitale's case. The matter was not pursued by the parties or addressed by the district court at the time the motion for summary judgment was under consideration. The Town could only be found liable if it or the Town Manager[8] knew or should have known that the Chief was not training his police officers properly and then failed to

take reasonable measures to rectify the situation. *See Languirand v. Hayden,* 717 F.2d at 227–28. *See also Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir.1984) (en banc). Whether or not there is sufficient evidence in the record to create a jury question on this score will be for the district court to determine.

### THE EVIDENTIARY RULINGS

Vitale has objected to four areas of testimony which he claims were prejudicial and irrelevant. Since these objections may arise on retrial, we deem it advisable to rule on them now. We note first that any evidence which is harmful to a party is in that sense prejudicial; the question, therefore, is whether "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

■ The first evidentiary area was the admission of testimony to the effect that police officers, other than Vitale and Wheeler, who arrived on the scene after the shooting beat up the passengers in the Voutour automobile. This certainly might have a prejudicial effect on Vitale's case. As we read the trial transcript, the probative purpose of the testimony was threefold: to show how certain marks got on the Voutour automobile, an important and disputed factual issue; to explain the testimony of passenger MacDonald on cross-examination that he had testified previously that he would like to get even with the Saugus police; and to show the position of the passengers in the car. Under the circumstances, the district court's ruling that the probative value of the testimony outweighed the danger of unfair prejudice was not, in our view, error. The danger was minimized by the court's instruction at the time the evidence was admitted, and repeated in the charge, that the beating of the passengers "has nothing to do with what Mr. Vitale did or did not do in shooting Mr. Voutour."

---

**8.** Under the Town ordinances and bylaws, the Town Manager had the responsibility for the hiring of police officers and had some supervisory authority over the Chief of Police.

■ Secondly, Vitale objects to Voutour's testimony that after the shooting he heard a police officer say: "This is going to be a very hush-hush case." Contrary to the representation in Vitale's brief, it is not clear that this statement was not made by Vitale. Voutour testified that he did not know who any of the police officers were that night, and that the statement was made by the officer who checked his pulse right after the shooting. There was evidence from which the jury could have found that Vitale was the one who checked Voutour's pulse and made the "hush-hush" statement to Wheeler. There was no abuse of discretion in admitting the testimony.

■ Finally, Vitale objects to the testimony of the ambulance attendant that he was not informed by the police that Voutour had been shot. The attendant's testimony was that the police, he did not know which officer, told him that Voutour was a motor vehicle accident victim and it was not until Voutour was examined at the hospital that he learned that Voutour had been shot. This testimony was admissible to impeach Vitale's testimony that he had told the ambulance driver and the attendant that Voutour had been shot.

## THE REQUESTED JURY INSTRUCTIONS

■ For the sake of completeness, and to forestall this objection arising upon retrial, we address the plaintiff's claim that the district court erred in failing to explicitly instruct the jury that the defendant had no more right under Massachusetts law than an ordinary citizen to use deadly force. It appears to be an accurate proposition that the law of Massachusetts does not grant police officers any more right than an ordinary citizen to shoot someone to protect a third person. It is our opinion, however, that an instruction to this effect would be, at best, irrelevant and, at worst, misleading.

The district court instructed the jury that the crucial question in plaintiff's section 1983 claim was whether the defendant's use of force was unreasonable and excessive. In not allowing an independent good faith defense to the section 1983 action, the district court implicitly recognized that Officer Vitale in his official capacity had no special privilege or entitlement to shoot the plaintiff. The district court informed the jury that the police privilege to use deadly force to arrest a felon was not in issue. She instructed the jury to take into account all circumstances in determining whether Officer Vitale's use of deadly force to protect his partner was unreasonable and excessive. The jury was asked to consider the fact that Vitale was a senior officer in a patrol car and Wheeler was a reserve officer, to consider whether Wheeler's life was in fact in danger, whether Wheeler would have been entitled to use force for himself, and whether a reasonable person in the position of Vitale would have thought force necessary to protect Wheeler. This instruction is consistent with the law of Massachusetts.

While the issue of a police officer's use of force for the purpose of protecting a third person has not been directly discussed by the Massachusetts Supreme Judicial Court, its treatment of a police officer's use of deadly force to effect an arrest indicates that no distinction would be drawn between a police officer's use of deadly force to protect and a private citizen's use of deadly force to protect. In *Julian v. Randazzo*, 380 Mass. 391, 403 N.E.2d 931 (1980), a police officer's use of deadly force to effect an arrest was found to be limited in the same way a private citizen's use of such force to effect an arrest would be limited. *Id.* 403 N.E.2d at 934. Where the Massachusetts courts have considered the use of deadly force by a private citizen to protect a third person, they have adopted a reasonableness standard. *Commonwealth v. Martin*, 369 Mass. 640, 341 N.E.2d 885, 891 (1936).

This standard, however, "may depend in part upon the relationship of the persons involved." *Id.* Consequently, Vitale's official status as a police officer, while giving him no special rights, remained an important consideration in the jury's assessment of the events. The issue of whether the defendant acted reasonably is not at all dependent upon any equality of rights between police officers and private citizens, but rather upon a determination of whether the defendant's use of force was excessive *in the circumstances.* In the circumstances, Vitale was a police officer and Wheeler was his partner. Vitale's status as a police officer cannot be eliminated from the circumstances, nor should it be. The standard of reasonableness relates back to what is reasonable conduct for a person in the actor's position. That police officers and other citizens have equal rights to use discretion in protecting one another and equal rights to use their own judgment and act accordingly is not relevant to a standard of reasonableness which is dependent upon all the variables present in the situation. The analysis involved must go deeper than the presumed equality of rights and the instruction requested was properly rejected.

## SUMMARY

So much of the judgment as awarded damages to Voutour against Vitale on the claim under Massachusetts law for assault and battery is vacated. The part of the judgment dismissing Voutour's section 1983 claim against Vitale is also vacated. Both claims are remanded for a new trial.

The summary judgment in favor of Wheeler on the section 1983 claim against him is affirmed.

The summary judgments in favor of the Chief of Police and Town of Saugus on Voutour's section 1983 claims against them based on the contention that they established a policy or custom of using excessive force are affirmed.

The summary judgments in favor of the Chief of Police and Town of Saugus on Voutour's claims against them under section 1983 alleging their responsibility for inadequate police training are vacated, and these claims are remanded for further proceedings not inconsistent herewith.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

BOWNES, Circuit Judge (concurring).

I concur in the result of the per curiam opinion, but write specially to express my disagreement with two aspects of the analysis found therein. First, I believe there is no need to rely upon tort concepts of negligence or gross negligence to determine whether liability will attach under § 1983. When the per curiam opinion uses this tort language, it is not really discussing the presence of tort negligence or gross negligence, but simply the issue of foreseeability of consequences. Foreseeability as a factor of § 1983 liability is different than foreseeability as a factor of tort liability. Negligence and gross negligence are defined by reference to common law concepts of duty of care; foreseeability under § 1983 is defined by reference to constitutional and statutory standards which a reasonable government official can be expected to know, *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). As a result, conduct which may be viewed as grossly negligent is not necessarily conduct for which liability may attach under § 1983. The per curiam opinion appears to recognize this in its analysis of the claim against Officer Wheeler; although Officer Wheeler's conduct might sustain a jury finding of gross negligence, it could not sustain a jury finding of liability under § 1983 because the *constitutional* repercussions of his conduct were not sufficiently foreseeable. Given this divergence and the different focuses of tort law and § 1983, I think it would be both more accurate and less confusing to avoid the language of tort law in determining liability under § 1983. Thus

the analysis of the claim against Chief Forni, while it is couched in terms of gross negligence, could be quite easily recast along the lines of the analysis of the claim against Officer Wheeler: whether the constitutional repercussions of his conduct were sufficiently foreseeable to justify holding him liable under § 1983.

My second objection to the analysis found in the per curiam opinion stems from the requirement that a finding of gross negligence as opposed to simple negligence is necessary for supervisory liability. Leaving aside my objections to the use of these tort concepts, what this results in is a requirement that the likelihood or foreseeability of constitutional repercussions be very high before liability attaches under § 1983. While I recognize the per curiam opinion follows the vast majority of courts in requiring a level of foreseeability comparable to that required for a finding of gross negligence, I find little justification for this. The Supreme Court has never directly addressed this issue and I do not believe that such a high standard can be inferred from its other § 1983 decisions. In particular, I do not read either *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), or *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), to foreclose a lower standard of foreseeability—one comparable to simple negligence. Neither the *Rizzo* requirement of an "affirmative link" between the constitutional deprivation and the challenged conduct, 423 U.S. at 371, 96 S.Ct. at 604, nor the *Monell* requirement that official policy be the "moving force of the constitutional violation," 436 U.S. at 694, 98 S.Ct. at 2038, speak to more than the requirement that there be an affirmatively shown causal connection between the challenged conduct and the constitutional deprivation. In *Monell*, the Court characterized *Rizzo* as having rejected *respondeat superior* as a basis for § 1983 liability, thereby rejecting vicarious liability based on considerations of public policy rather than fault or causation.

I suggest that the "objective reasonableness" standard of qualified immunity set out in *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2739, requires a test of "objective foreseeability" which is lower than the one imposed by the gross negligence standard. If the knowledge expected of government officials is that which a reasonable person could be expected to have, the foresight expected of government officials should be the same—that of a reasonable person. As a practical matter, this lower standard would have no effect on the results in this case.

There is one final point which needs to be addressed. In a footnote discussing the possible application of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to deprivations of life or liberty, the per curiam opinion states that it might be reasonable to hold that state negligence remedies afford sufficient process for negligent deprivations of life or liberty. I do not believe that *Parratt* should be extended beyond deprivations of property. *See Parratt*, 451 U.S. at 545, 101 S.Ct. at 1918 (Blackmun, J., concurring); *Hudson v. Palmer*, —— U.S. ——, —— n. 4, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part). Life and liberty interests are such that due process cannot be satisfied procedurally by the provision of post-deprivation remedies. At some point, "procedural due process shades into substantive due process, and *Parratt* becomes inapplicable." *Thibodeaux v. Bordelon*, 740 F.2d 329, 338–39 n. 9 (5th Cir.1984).

## ON REHEARING

While the petition for rehearing correctly points out several lapses in the statement of facts in our opinion, which we [have corrected] ..., we do not find, after careful review, that these affect or should affect our determination that the issues of the possible liability of Chief Forni and the Town of Saugus should *not* be resolved on

a motion for summary judgment. Viewing the facts most favorably for plaintiff, we think a sufficient showing was made of genuine issues of material fact concerning whether or not the Chief and Town are liable under 42 U.S.C. § 1983 for having violated the plaintiff's constitutional rights.

 Our determination in this regard does not, as stated on page 822 of our opinion, foreclose defendants' right at the close of evidence to seek the district court's review of the sufficiency of the evidence by motion for a directed verdict.[1] By then, especially after examination and cross-examination of witnesses, *see* C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2532 (1971), the parties may well have presented a far more complete and meaningful picture of what training Vitale had received and what the Chief and Town of Saugus knew or had reason to know. The district court will be able to determine, as a matter of law, whether a jury has a sufficient basis on that record for finding that the Chief was grossly negligent to the point of conscious indifference with respect to Vitale's training, and also whether there is sufficient evidence to support a verdict against the Town of Saugus. *See* page 823. Our present ruling should not be understood as necessarily prejudging such a motion.

We must mention a further point. On January 8, 1985 the Supreme Court heard argument in *Oklahoma City v. Tuttle*, No. 83–1919, 53 U.S.L.W. 5300. The Court's decision in that case could be highly significant with respect to the claim against the Town of Saugus, since the issue before the Court involves determination of the circumstances in which a municipality is liable for misconduct of a police officer. *Tuttle* could also shed some further light on the law pertaining to the claim against Chief Forni. Needless to say, when this case goes back to the district court, this circuit's directions in the current opinion must yield to any rulings the Supreme Court may by then make in *Tuttle* or elsewhere. To the

extent the Supreme Court in *Tuttle* lays down principles that differ from any of our present rulings, the district court on remand may and should apply its best understanding of the Court's decision without further application to us.

\*    \*    \*    \*    \*    \*

*The petition for rehearing is denied.*

---

**1.** In respect to the Town of Saugus we also emphasized in our opinion the need to prove not only that the Chief had been grossly negligent to the point of conscious indifference with respect to training Vitale, but that the Town, through its Town Manager or otherwise, knew or should have known of the Chief's dereliction. *See* page 823. This issue may be pursued on remand by summary judgment procedures as well as at trial.