Patrick H. **WOODLEY**, Plaintiff,

v.

**TOWN OF NANTUCKET et al.**, Defendants.

Civ. A. No. 81–2766–G.

United States District Court, D. Massachusetts.

Oct. 9, 1986.

As Amended Oct. 17, 1986.

Michael C. Donahue, James D. Hanrahan, Seridan, Garrahan and Lander, Framingham, Mass., for plaintiffs.

Robert D. Keefe, Hale & Dorr, Boston, Mass., for defendant Pearson.

Douglas Seaver, Randy Komisar, Gaston Snow & Ely Bartlett, Boston, Mass., for defendant Town of Nantucket.

Douglas Seaver, Gaston Snow & Ely Bartlett, Richard Zisson, Zisson & Veara, Boston, Mass., for defendant Hunter.

## MEMORANDUM AND ORDERS ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GARRITY, District Judge.

Plaintiff commenced this action against the Town of Nantucket (the "Town"), its Chief of Police, Paul S. Hunter ("Hunter"), and a member of the Nantucket Police Department, John S. Pearson ("Pearson"), pursuant to 42 U.S.C. § 1983[1] and Massachusetts law, for the arrest of plaintiff,

1. 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

allegedly without probable cause, in connection with a rape occurring in the early morning hours of August 13, 1981. The case comes before the court on the motions for summary judgment submitted by each of the three defendants. After reviewing the briefs and exhibits submitted by the parties, and after hearing oral argument, the court denies the motions.

## I. *Facts*

The apparent victim of the rape, Sheila Saunders, was a summer visitor to Nantucket in 1980 and 1981. During the summer of 1980 she rented a room in plaintiff Woodley's home. He had no further contact with her until the night of August 12, 1981, when he saw her at a cafe in Nantucket. After conversing with her and her friends, Woodley drove them to a local nightspot. Later, Saunders and her friends left the nightclub to walk to another nightspot. While walking with her friends, Saunders was pulled off the road, dragged into the woods and assaulted.

Officer Pearson and Officer Judy Chambers were sent by the Nantucket Police Department dispatcher to the hospital to interview the victim. She described her assailant as "about five feet seven inches, slim build, dark straight hair, dark skin, definitely white but with a good dark tan, medium-sized moustache, between 20 to 25 years old, with a Yankee accent, wearing a baseball cap, blue jeans and a white T-shirt with some kind of logo on it." [2]

In interviews shortly after the assault, the victim indicated that she may have known her assailant. On August 14, 1981, she assisted County Identification Officer Patterson in making a composite drawing of her assailant. Defendants allege that the drawing bore a striking resemblance to Woodley. At that time Saunders told Pearson that she could not eliminate Woodley as a suspect.

On August 16, Officer Pearson met with the victim and her parents. The parents informed him that Woodley had telephoned Saunders the previous evening. Woodley also had telephoned the Nantucket Police Department twice to inquire about the victim's condition and to offer assistance in the investigation. According to Pearson and Chief Hunter, these inquiries were suspicious because the victim's identity had not yet been released to the public.[3]

On or about August 15, Captain Rezendes of the Nantucket Police Department received a tip from a local resident named Augie Ramos. Ramos told Rezendes that the victim had rented a room from Woodley the previous summer and had had several disputes with him. Ramos indicated that Woodley was Saunders' assailant. This information was communicated by Rezendes to Officer Pearson and Chief Hunter.

On August 19, nearly a week after the assault, Hunter directed Pearson to question the plaintiff. At that time, the Nantucket Police had no real suspects and, apart from the victim, had not interviewed anyone, including a young black man who was identified specifically by witnesses as having been at the scene of the crime. During the questioning, Woodley stated that he had heard that the victim had been beaten with a brick. According to Pearson, only 3 or 4 officers knew at that time that a brick had been used in the assault. Also during the interview, Woodley provided Pearson with the name and address of an alibi witness, Mary Coughlin. It is undisputed that neither Pearson nor any other member of the Nantucket police ever contacted Mary Coughlin prior to Woodley's arrest.

---

**2.** In a subsequent interview of the victim on August 26 by Lieutenant Arnold of the Massachusetts State Police, she stated that when she had seen Woodley at the cafe on the night of her assault, he was wearing blue jeans, a turquoise and yellow flowered Hawaiian shirt, and no hat.

**3.** Plaintiff testified in his deposition that Saunders and a friend had stopped at his house on the day of the assault and left a message with Saunders' phone number. Plaintiff expected Saunders to return to the house the following afternoon before she left Nantucket. However, she did not return and when plaintiff learned from his brother several days later that "a girl from North Carolina" had been assaulted, he became concerned. He tried to call Saunders, the hospital and the police station to inquire about her condition.

After conferring with Chief Hunter, Pearson contacted Woodley to ask if he would take a polygraph test and he agreed. The polygraph examiner, Edward McGrath, concluded, based on an evaluation of the polygraph charts obtained from Woodley, that Woodley's responses to the relevant questions were untruthful. The results of the test were communicated to Hunter and Pearson, and the latter disclosed the results of the test to the victim's father. Not surprisingly, the father communicated this information to his daughter.

Chief Hunter and Pearson then met with Barnstable County Assistant District Attorney O'Neill, who advised the officers that an identification procedure was the next step in the investigation, and advised them to seek the assistance of the state police. O'Neill stated in his deposition that he cautioned both Hunter and Pearson not to proceed any further with identification procedures until the state police got involved in the investigation. Hunter, however, denied in his deposition that such a communication ever occurred.

Thereafter, the District Attorney learned that Officers Pearson and Chambers were planning a trip to South Carolina to interview Saunders. O'Neill contacted Lieutenant Arnold of the state police, who strongly advised against the trip and thought that the victim should be brought to Massachusetts. O'Neill contacted Pearson and told him to cancel the trip. O'Neill also called Hunter and reiterated Lt. Arnold's advice and explained that Pearson's lack of experience and competence threatened the critical pretrial identification procedure. Hunter testified in deposition that O'Neill never called him. Pearson, however, testified that Hunter was fully aware of O'Neill's position on the South Carolina trip but directed him and Chambers to proceed with the trip anyway. Furthermore, Pearson maintains that Hunter told him that the purpose of the trip was to obtain an identification and specifically mentioned Woodley. According to Pearson, he had been asked by Chief Hunter to investigate only one individual and he had no suspects other than Woodley in mind when he travelled to South Carolina.

Pearson and Chambers arrived in South Carolina on August 20. They were informed by Mr. Saunders that he had told his daughter that Woodley had failed the polygraph examination. On August 21, Pearson and Chambers interviewed Saunders. When she was unable to identify her assailant conclusively, Pearson told her that she did not have to be one hundred percent sure, but she had to be sure "beyond a reasonable doubt, beyond a shadow of a doubt." Saunders requested time alone to consider the matter further.

That evening, the officers interviewed the victim again. During the interview, she stated that she was "reasonably sure, had a gut feeling" that her assailant was Woodley. Pearson then told Saunders about the polygraph test, and about what the examiner was able to conclude from its results. Pearson also gave Saunders a photograph of Woodley, saying, "This is Woodley, this is our man," and then compared it to the composite, remarking that they looked the same and did it make her "feel better." Saunders conceded that the resemblance made her feel better.

Immediately after this last meeting with the victim, Pearson called Hunter to report a positive identification. Officer Chambers, however, was of the opinion that Saunders could not identify anyone. Chief Hunter testified in deposition that he was unaware of Chambers' doubts about the identification at the time of Woodley's arrest. Woodley, however, contends that Hunter never bothered to question Officer Chambers about the identification or include her in any of the post-identification interviews. Moreover, the town prosecutor, Robert Mooney, testified in his deposition that after learning from Chambers that Saunders' identification was questionable, he confronted Chief Hunter with this information. Hunter suggested that Mooney speak to Pearson. According to Mooney, Pearson told him that Saunders' identification was "one hundred percent positive" and that Pearson did not even have to show Saunders the photographic lineup because she identified Woodley right away.

After conferring further with Hunter and Pearson, Mooney called District Attorney Rollins. Rollins testified that based on both Mooney's and Pearson's representations about the solidity of the identification, he authorized Pearson to seek a warrant for Woodley's arrest.

Woodley was arrested pursuant to that warrant on August 24. Following the arrest, the victim's attorney contacted O'Neill and Mooney to report that she was withdrawing her identification. Additionally, plaintiff's alibi witness, Mary Coughlin, was interviewed for the first time by Mooney, who concluded that her statements fully corroborated Woodley's story. Subsequently, Rollins entered a *nolle prosequi* in the case, which stated that "no other evidence [other than the identification] at this time inculpates the defendant." Plaintiff was released.

Following Woodley's release, an investigation revealed that Officer Pearson had falsified his application for employment with the Nantucket Police Department by listing fictitious degrees from Northeastern University and Harvard Business School. According to the brief submitted by the Town in support of its motion, the Board of Selectmen entrusted the verification of prospective employees' qualifications to the Chief of Police, who, at the time Pearson applied for a position on the police force, was acting chief Captain Rezendes. However, two members of the Board of Selectmen interviewed Pearson and approved his employment without ever seeing written verification of his credentials or the required police academy certificate, and without ever inquiring as to why a Harvard Business School graduate was working as a gas station attendant on Nantucket Island.

## II. *Defendant Pearson's Motion for Summary Judgment*

Officer Pearson has moved for summary judgment, arguing that the undisputed facts show that he had probable cause to arrest plaintiff or, alternatively, that even if there was a deprivation of plaintiff's constitutional rights, the doctrine of qualified immunity shields him from liability.

The initial inquiry under Section 1983 is "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 1981, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420. There is no dispute as to whether the first requirement has been met. The conduct complained of was committed by a police officer acting in his official capacity. With respect to the second element of liability, Pearson argues that, as a matter of law, plaintiff has not been deprived of any constitutionally protected interest.[4]

Woodley alleges that Pearson deprived him of his fourth and fourteenth amendment rights by arresting him without "probable cause" for the aggravated rape of Ms. Saunders. This circuit has recognized a cause of action under Section 1983 for an arrest made without probable cause, in violation of the fourth amendment's proscription against unreasonable seizures. *See Briggs v. Malley*, 1 Cir.1984, 748 F.2d 715, *aff'd on other grounds*, 1986, — U.S. —, 106 S.Ct. 1092, 89 L.Ed.2d 271; *see also Schiller v. Strangis*, D.Mass.1982, 540 F.Supp. 605, 611. Initially, then, the question of whether a deprivation of Woodley's civil rights occurred turns on the existence or absence of probable cause at the time the arrest was made. Probable cause ex-

---

4. The second basic requirement of Section 1983 contains two distinct elements: (1) there must have been a deprivation of federally protected rights, privileges or immunities, and (2) the conduct complained of must have been causally connected to the deprivation. As to the second element, it is clear from the Supreme Court's recent decision in *Malley v. Briggs*, 1986, —

U.S. —, 106 S.Ct. 1092, 1098 n. 7, 89 L.Ed.2d 271, that the causal chain between the submission of an application for a warrant and the ensuing arrest is not broken by the magistrate's intervening decision to issue a warrant. Accordingly, the court need only consider whether the first element has been met.

ists when facts and circumstances within the arresting officer's knowledge, or of which he has reasonably trustworthy information, are sufficient to warrant a person of reasonable caution and prudence in the belief that the defendant has committed a crime. *Floyd v. Farrell,* 1 Cir.1985, 765 F.2d 1, 5.

In support of his motion Pearson relies on the following information, in his possession at the time of Woodley's arrest, to establish probable cause as a matter of law: Woodley's suspicious phone calls to the Nantucket police and to the Saunders residence after the incident; a tip from a reliable informant that Woodley was the assailant; the results of the polygraph test; the resemblance between Woodley and the composite sketch prepared from Saunders' description of her assailant; Woodley's knowledge of certain details of the case that had not been publicly disclosed; Pearson's inability to locate Woodley's alibi witness; and Saunders' positive identification of Woodley as her assailant.

■ Deposition testimony presented by Woodley, though not refuting these facts entirely, undercuts Pearson's characterization of the information available to him at the time of the arrest. At a minimum, the testimony creates a genuine issue as to the substance of that information and the validity of the disputed arrest. For instance, Woodley testified that his questionable phone calls were made to inquire as to Saunders's condition and whereabouts after learning that "a girl from North Carolina had been raped", and that they were not a veiled attempt to find out the progress of the investigation. Additionally, viewing the facts in the light most favorable to plaintiff, it could be inferred that Saunders did not identify Woodley positively as her assailant and that Pearson

knew that the identification was faulty, in part due to his own orchestration. This inference follows from (1) testimony concerning Pearson's and the victim's conduct during the identification procedure, (2) Pearson's prior disclosure of polygraph test results to the victim's father, and (3) Pearson's own testimony that Hunter had sent him to South Carolina for the express purpose of obtaining an identification of Woodley as Saunders's assailant.

The evidence also raises questions concerning the probative value and reliability of the tip, which apparently consisted of a bare and conclusory allegation that Woodley was the assailant since he had been Saunders's landlord the previous summer and had had "a dispute" with her. Lastly, Pearson's failure to locate and interview Woodley's alibi witness after only one day of attempting to do so casts doubt on the reasonableness of his conduct.

In sum, the plaintiff has raised a genuine issue as to what information Pearson in fact had at the time he applied for the arrest warrant and whether that information was reasonably trustworthy and reliable. *Cf. Celotex Corp. v. Catrett,* 1986, —— U.S. ——, ——, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. Furthermore, the probable cause determination—i.e., whether the facts and circumstances warranted a person of reasonable caution and prudence in believing that Woodley had committed a crime—is left more appropriately to the trier of fact. *See Losch v. Borough of Parkesburg,* 3 Cir.1984, 736 F.2d 903, 908 (conflicting descriptions of events that can be clarified by cross examination at trial militate against summary judgment). Questions concerning the reasonableness of conduct and beliefs do not lend themselves easily to determination on a motion for summary judgment.[5]

5. At the present time, the court will not treat in detail the separate issue of how far Officer Pearson's conduct must depart from the norm for a constitutional tort to be proven. The analysis of *Malley v. Briggs* suggests that simple negligence, i.e., an unreasonable conclusion that probable cause existed, may be sufficient. In addition, the question of standards of liability may actually be subsumed under the wide ranging immunity analysis called for in that case. However, there is language suggesting that since any probable cause decisions are inherently imprecise, the violation of rights must be absolutely certain for immunity to be lost. *Briggs v. Malley,* 1 Cir.1984, supra, at 719. Whether this calls for a standard akin to gross negligence is unclear. *Cf. Daniels v. Williams,* 1986, —— U.S. ——, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (injuries arising merely out of an official's negligence are not actionable under Section 1983).

Pearson has also claimed good faith immunity from liability, a defense which the Supreme Court has recently considered in cases of this nature. *Malley v. Briggs,* 1986, —— U.S. ——, 106 S.Ct. 1092, 89 L.Ed.2d 271. In *Malley* the Court stated that the inquiry into good faith in such situations is confined to the objectively ascertainable question of "whether a reasonably well-trained officer in [Pearson's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 1098.[6] In the context of Pearson's motion for summary judgment, he must demonstrate that his belief that there was probable cause to arrest Woodley was objectively reasonable as a matter of law because another officer standing in Pearson's shoes and having the same information reasonably would have come to the same conclusion. *See Floyd v. Farrell,* 1 Cir.1985, 765 F.2d 1, 5.[7] Despite the policy favoring summary judgment on the issue of immunity, *see Harlow v. Fitzgerald,* 1982, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, the court finds summary judgment to be inappropriate in this instance for several reasons.

■ First, as discussed *ante,* there are disputed issues of fact as to what information was available to Pearson when he applied for the arrest warrant and, thus, as to how a reasonable officer would have acted under the circumstances. Second, many of the available facts are subject to varying interpretations, such as the identification by Ms. Saunders and the conferences with prosecutorial officials. The facts could either back up Pearson's argument for probable cause or show a pattern of blunders and deception, depending on the actual testimony at trial. This sort of weighing and sifting of the facts, and forming an impression of what occurred, is more securely within the domain of the factfinder, i.e., the jury. Lastly, to the extent Pearson's immunity turns on the objective reasonableness of his conduct, evidence about professional standards and common police practices will be highly relevant. The court lacks adequate evidence at present to determine whether Pearson's behavior sufficiently departs from established norms to make out a constitutional violation. Summary judgment, therefore, is not warranted. *See, e.g., B.C.R. Transport Co., Inc. v. Fontaine,* 1 Cir.1984, 727 F.2d 7, 10; *Bibbo v. Mulhern,* D.Mass.1985, 621 F.Supp. 1018, 1027.[8]

### III. *Defendant Hunter's Motion for Summary Judgment*

Defendant Hunter, Nantucket's Police Chief, moves for summary judgment on all the federal statutory and state law claims against him. With regard to the Section 1983 claim, the complaint alleges that Hunter was given sole responsibility by the Town for the supervision of police department operations and for the training and supervision of police officers. Plaintiff specifically alleges that Hunter, by virtue of his inadequate training policy and his encouragement of Pearson's disputed con-

---

6. It is beyond dispute that by the autumn of 1981, when the disputed events occurred, defendants had ample notice of plaintiff's right to be free from unlawful searches and seizures and of their potential liability under Section 1983 for a deprivation of that right. *E.g., Monroe v. Pape,* 1961, 365 U.S. 167, 170–71, 81 S.Ct. 473, 475, 5 L.Ed.2d 492; *see also Stadium Films, Inc. v. Baillargeon,* 1 Cir.1976, 542 F.2d 577; *Madison v. Manter,* 1 Cir.1971, 441 F.2d 537.

7. Merely questionable or borderline cases should not give rise to liability, however. As the Supreme Court pointed out, "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs, supra,* 106 S.Ct. at 1096. The Court went on to state that "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.*

8. The narrow inquiry in *Losch v. Borough of Parkesburg, supra,* at 909–10, focusing on the clarity of the plaintiff's rights rather than the propriety of defendant's conduct, is consistent with the spirit of *Harlow.* However, the narrowly focused approach in *Losch* has apparently been foreclosed by the Supreme Court's decision in *Malley v. Briggs,* adopting an "objective reasonableness" test. Since that test, like the malice standard prior to *Harlow,* makes the entry of summary judgment problematic, the future relevance of *Harlow* and its policy concerns is debatable.

duct, caused a deprivation of plaintiff's fourth and fourteenth amendment right to be free from illegal arrest.

Hunter, in support of his motion, contends that he is entitled to summary judgment on several grounds: (1) the evidence does not raise a genuine issue as to whether he acted with gross negligence regarding Pearson's allegedly unconstitutional arrest of plaintiff; (2) the doctrine of qualified immunity shields him from any civil liability arising out of plaintiff's arrest; and (3) he cannot be held vicariously liable for the acts of his subordinate, Officer Pearson. The court finds no merit to any of these contentions and accordingly denies Hunter's motion for summary judgment.

■■■ While the contours of supervisory liability have not been established with precision, a clear outer limit to that liability has been recognized: supervisors cannot be held responsible under Section 1983 for their subordinates' misconduct on a theory of *respondeat superior*. *Monell v. New York City Department of Social Services*, 1978, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611. The Supreme Court has required an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials. *Rizzo v. Goode*, 1976, 423 U.S. 362,

371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561; *see* Schuck, *Suing our Servants: The Court, Congress, and the Liability of Public Officials for Damages*, 1980 Supt.Ct.Rev. 281, 294. The Court of Appeals for this circuit, applying the Supreme Court's language, has discussed various bases of a supervisory official's liability. *Voutour v. Vitale*, 1 Cir.1985, 761 F.2d 812, 819–20, *cert. denied*, 1986, —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916. It is against this background that plaintiff's theories of liability and Hunter's motion must be analyzed.

A. *Hunter's Failure to Train his Officers*

■■■ A supervisory official may be liable under Section 1983 for a failure to train properly employees working under his command. To be actionable, that failure must be the result of gross negligence amounting to deliberate indifference and be causally linked to the subordinate's violation of the plaintiff's civil rights. *Voutour v. Vitale, supra*, at 820.[9] The record shows that Hunter did not establish any guidelines, procedures or training programs for officers concerning criminal investigations even though he was given exclusive control by the Town over the day-to-day operations of the police department. M.G.L. c. 41, § 97A.[10] The difficulties with this practice

9. Supervisory liability arises not from the acts or omissions of the subordinate, but rather from the supervisor's own conduct in failing to implement a training program for officers or implementing a program that is grossly inadequate to prevent the type of harm suffered by the plaintiff. When such conduct is causally linked to the subordinate's violation of plaintiff's civil rights, supervisory liability is not, contrary to Hunter's assertion, vicarious but personal to him. *See, e.g., Kibbe v. City of Springfield*, 1 Cir.1985, 777 F.2d 801, 803, *cert. granted*, 1986, —— U.S. ——, 106 S.Ct. 1374, 89 L.Ed.2d 600; *Marchese v. Lucas*, 6 Cir.1985, 758 F.2d 181, 188–89, *petition for cert. filed*, Aug. 29, 1985; *Wellington v. Daniels*, 4 Cir.1983, 717 F.2d 932, 936.

10. The statute reads as follows:

In any town which accepts this section there shall be a police department established by the selectmen, and such department shall be under the supervision of an officer to be known as the chief of police. The selectmen of any such town shall appoint a chief of police and such other officers as they deem

necessary, and fix their compensation, not exceeding, in the aggregate, the annual appropriation therefor. In any such town in which such appointments are not subject to chapter thirty-one, they shall be made annually or for a term of years not exceeding three years, as the selectmen shall determine, and the selectmen may remove such chief or other officers for cause at any time after a hearing. The chief of police in any such town shall from time to time make suitable regulations governing the police department, and the officers thereof, subject to the approval of the selectmen; provided, that such regulations shall become effective without such approval upon the failure of the selectmen to take action thereon within thirty days after they have been submitted to them by the chief of police. The chief of police in any such town shall be in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders. Section ninety-seven shall not apply in any town which accepts the provisions of this sec-

of inaction are revealed in the case of Officer Pearson. There was evidence indicating that Hunter should have known that Pearson's credentials and background were suspect, such as the rather unusual circumstance that a police officer who had previously worked as a gas station attendant had received a degree from Harvard Business School. Hunter, however, made no effort whatsoever to verify Pearson's claims or to investigate even the most basic training required of a police officer. In the instant case, therefore, there are genuine factual issues concerning Hunter's alleged failure to train which are sufficient to defeat the motion for summary judgment.[11]

### B. *Hunter's Improper Encouragement of Pearson*

■ Quite apart from the failure to train his officers, including Pearson, there is a strong indication that Hunter directed or at least encouraged Pearson's conduct, and thus was personally culpable along with Pearson for the plaintiff's arrest. In this view, it is not a general policy of improper training or a policy of encouraging illegal arrests that is at issue; rather, it is Hunter's personal involvement in this particular arrest. While Hunter may not have had a hand in every detail of the investigation and arrest, his supervisory role appeared sufficient to create the "affirmative link" required in *Rizzo v. Goode, supra*, 423 U.S. at 371, 96 S.Ct. at 604, for a managerial employee's liability. *See Kostka v. Hogg*, 1 Cir.1977, 560 F.2d 37, 40 ("if the police chief ordered the constitutional violations or possibly, if he deployed or hired the officer under conditions which he should have known would create a threat to the constitutional rights of the citizenry, damages may well be proper").

There are several indicia of the direct link between Chief Hunter's conduct and the plaintiff's arrest. First, he assigned Pearson, a low-ranking and inexperienced officer, to lead the investigation of plaintiff even though the case involved a very serious offense and required considerable care once the complainant left the area. Ms. Saunders's absence complicated the process of obtaining a fair identification. There is also testimony, from Pearson, that Hunter personally directed the investigation and specifically ordered the officer to South Carolina to secure an identification of the plaintiff.[12] In addition, some testimony suggests that as the investigation proceeded, Hunter ignored warnings and complaints about Pearson's inexperience, and possible incompetence in pursuing the plaintiff.

The final and perhaps strongest linkage is evidence that Hunter ignored blatant defects in Pearson's grounds for arresting the plaintiff. Despite concerns voiced by Officer Chambers and town prosecutor Mooney about the reliability of the victim's identification of the plaintiff, of which Hunter was allegedly aware, the Chief never questioned her about it and never asked her to join in meetings with Mooney and the district attorney regarding the plaintiff's arrest. Moreover, when Pearson informed the district attorney, in Hunter's presence, that the identification was "positive", "beyond a shadow of a doubt", and "better than the best", Hunter remained silent.

The question in this case is whether Chief Hunter is liable either for directing the allegedly illegal arrest in this case or for failing to train his officers in a manner that could have prevented the disputed conduct by Officer Pearson.

---

tion. Acceptance of the provisions of this section shall be by a vote at an annual town meeting.

**11.** In *Voutour v. Vitale, supra*, at 819, the court observed that a custom of using excessive force, as well as a failure to train, could serve as the basis of a supervisory officer's liability under Section 1983. *Cf. Rizzo v. Goode*, 1976, 423 U.S. 362, 371, 383–86, 96 S.Ct. 598, 604, 610–11, 46 L.Ed.2d 561. Plaintiff has not alleged and certainly has not shown a custom of making improper arrests in the Nantucket police force.

**12.** Hunter also sent Officer Judy Chambers to South Carolina to assist Pearson with the identification. Chambers was a "special officer" and as such, was not police academy trained or given the duties of a regular officer; ironically the "regular" officer in this case also lacked that training.

In opposition to this view of the facts, Hunter maintains that his participation was not nearly as extensive as some of the evidence, especially Pearson's testimony, suggests. He argues that his role was peripheral and that Pearson acted on his own initiative in developing a case against the plaintiff. Without further explanation at trial, the court is unable to determine which version of events is truthful and more adequately supported by all the evidence. *See Losch v. Borough of Parkesburg, supra,* at 908. At a minimum, the plaintiff has made a sufficient showing of Hunter's participation to raise a "genuine issue" of material fact as to whether he was grossly negligent in his direction and supervision of Pearson's investigation and ultimate arrest of the plaintiff. *See Turpin v. Mailet,* 2 Cir., 619 F.2d 196, 200–01, *cert. denied sub nom. Turpin v. City of West Haven,* 1980, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 ("The issue of authorization, approval or encouragement is generally one of fact, not law"). Summary judgment is therefore unwarranted on the ultimate question of whether Hunter "caused" a deprivation of plaintiff's rights within the meaning of Section 1983.[13]

### C. *Hunter's Immunity*

Hunter asserts, however, that the doctrine of qualified immunity shields him from any civil liability arising out of plaintiff's arrest. In *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. 2738, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." This holding does not dispose of the present motion, however. To the extent Chief Hunter directed or was otherwise involved in the plaintiff's arrest, his qualified immunity is no greater than that of Officer Pearson. The relevant question, as with Pearson, is whether Hunter reasonably should have known that an arrest predicated on the available evidence was lawful. It is unnecessary to repeat the reasons given for denying summary judgment outlined with regard to Pearson.

As to his potential liability for failure to train officers properly, the basic issue is one of foreseeability: whether it was reasonably foreseeable that failing to train Officer Pearson and other subordinates would lead to the sort of constitutional violation alleged. The question can be framed as one of qualified immunity under *Harlow, see Voutour v. Vitale, supra,* at 825–26 (Bownes, J., concurring), or simply as one of proximate causation in any tort case. However the question is characterized, the court finds insufficient certainty in the record to grant summary judgment. Genuine issues of material fact remain.

### IV. *Town of Nantucket's Motion for Summary Judgment*

The Town of Nantucket has moved for summary judgment,[14] claiming that as a matter of law plaintiff's constitutional rights were not abrogated by any "statute, ordinance, regulation, custom, or usage", 42 U.S.C. § 1983—statutory language commonly phrased simply as "official policy"—attributable to the town.[15] The plaintiff opposes the motion, apparently arguing that the town was culpable insofar as its Police Chief, Hunter, was its agent for making law enforcement policy and established the town's defective policy in this case or, in the alternative, that the town's apparent inaction on police matters is itself actionable as a policy under Section 1983. Before judging the parties' divergent con-

---

**13.** In view of the court's denial of summary judgment on the federal claims, it is unnecessary to reach the merits of plaintiff's state law claims against Hunter at this time.

**14.** The town moved for judgment on the pleadings or, in the alternative, for summary judgment. Because the motion presented matters outside the pleadings, it will be treated as one for summary judgment only. Fed.R.Civ.P. 12(c).

**15.** The defense of qualified immunity, asserted by Officer Pearson and Chief of Police Hunter as individuals, is not available to the town. *Owen v. City of Independence,* 1980, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673.

tentions, it is necessary to analyze the protean body of law controlling municipal liability for constitutional violations, as shaped by the Supreme Court in recent decisions.

In *Monell v. New York City Dept. of Social Services, supra*, 436 U.S. at 683–89, 98 S.Ct. at 2032–35, the Supreme Court dramatically expanded the scope of civil rights litigation when it held that municipalities were "persons", and thus not immune to suit, under Section 1983, overruling one aspect of the landmark decision in *Monroe v. Pape*, 1961, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (officials may act "under color of" state law even when they act in violation of specific laws or customs of the state). At the same time, the Court emphasized that municipal liability had certain distinct boundaries; specifically, municipalities did not face vicarious liability since Congress did not incorporate in Section 1983 a doctrine akin to *respondeat superior* at common law. *Monell, supra*, 436 U.S. at 691, 98 S.Ct. at 2036. This position has been reaffirmed unequivocally by majorities in later decisions. *E.g., City of Oklahoma City v. Tuttle*, 1985, 471 U.S. 808, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (plurality); *id.* at 2438–39 (Brennan, Marshall, Blackmun, JJ., dissenting); *but see id.* at 2441–47 (Stevens, J., dissenting, arguing that Section 1983 did not preclude *respondeat superior* liability). Hence the Court, interpreting congressional intent, has confined the municipality's liability to its "own illegal acts", *Pembaur v. Cincinnati*, 1986, —— U.S. ——, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452, and "to action for which the municipality is actually responsible." *Id.*

The Court's insistence on some sort of direct, rather than vicarious, liability is reflected in various of its formulations, including its view that official policy must be the "moving force" behind the constitutional violation, *Monell, supra*, 436 U.S. at 694, 98 S.Ct. at 2037, and that "there must be an *affirmative link* between the policy and the particular constitutional violation alleged." *Tuttle, supra*, 105 S.Ct. at 2436 (plurality) (emphasis added); *cf. Rizzo v. Goode, supra*, 423 U.S. at 371, 96 S.Ct. at

604. Yet such capsule statements have not clarified many of the issues that emerged after *Monell* was decided, and lower courts have struggled to give shape to the law. Complicating the problem has been the Supreme Court's own difficulty in building a majority behind a clear statement of the law. Out of this thicket, two issues at the heart of the debate over Section 1983's reach, and central to a decision in this case, have emerged: first, whose actions and decisions may establish a policy that is official for purposes of Section 1983, *see Pembaur, supra*, 106 S.Ct. at 1299–1300 (plurality); and second, which official actions and decisions may constitute a "policy" that is actionable under that statute. *Id.* at 1308–10 (Powell, J., dissenting). The court will consider each of these issues, in the context of the present case, in turn.

## A. Official Policymakers

It is clear from the Supreme Court's interpretation of Section 1983 that official acts of lawmakers, or of a "properly constituted legislative body", can establish a "policy" that is actionable under Section 1983. *Pembaur, supra*, at 1298; *Monell, supra*, 436 U.S. at 694, 98 S.Ct. at 2037; *see also Owen v. City of Independence*, 1980, 445 U.S. 622, 633, 100 S.Ct. 1398, 1406, 63 L.Ed.2d 673. It is equally apparent that lawmakers or other elected officeholders are not the only individuals who can be deemed to make official policy. The Court in *Monell, supra*, at 694, wrote that a local government is responsible under Section 1983 when "execution of [its] policy ... whether made by its lawmakers or by *those whose acts or edicts may fairly be said to represent official policy*, inflicts the [constitutional] injury...." (emphasis added). Later cases have not departed from this view. A plurality in *Tuttle, supra*, 105 S.Ct. at 2436, stated that liability under *Monell*, i.e. Section 1983, was proper if an injury was caused by a policy "which ... can be attributed to *a municipal policymaker*" (emphasis added); the emphasized language was not restricted to a specific category of people. Most recently, a

majority of the justices settled upon the following position:

> [T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," [citation omitted], and whose decisions therefore may give rise to municipal liability under § 1983. *Pembaur, supra,* 106 S.Ct. at 1298–99.

Thus, a variety of individuals through their conduct may set the local government's official policy.

With this guidance from the Supreme Court, the First Circuit has adopted a more concrete rule for determining whether a person's actions and decisions comprise an official policy: "in areas where a local governmental official alone is the ' "final authority or ultimate repository of ... power", that official's "conduct and decisions must necessarily be considered those of one 'whose edicts or acts may fairly be said to represent official policy' " for purposes of § 1983.' " *Small v. City of Belfast,* 1 Cir.1986, 796 F.2d 544, 552 (quoting *Williams v. Butler,* 8 Cir.1984, 746 F.2d 431, 436); *Blackburn v. Snow,* 1 Cir.1985, 771 F.2d 556, 571. The Court of Appeals took note of the continued volatility of this rule in other circuits, and of the inability to get more than a plurality of the Supreme Court to embrace the "final authority" language, *see Pembaur, supra,* 106 S.Ct. at 1299–1300, yet it adhered to the rule of *Williams v. Butler. Small v. City of Belfast, supra* at 552–553. Since *Small* was decided after *Pembaur,* it must be regarded as controlling in this case. It offers an effective way "to distinguish acts of the *municipality* from those of *employees* of the municipali-

ty, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur, supra,* 106 S.Ct. at 1298 (emphasis in original).[16]

An application of the "final authority" rule to the facts of this case does not require extensive analysis. Several specific officials appear to have had a part in making the town's policy regarding law enforcement. It seems that two members of the Board of Selectmen interviewed Pearson and approved his employment. Under *Monell* and *Owen,* the selectmen's actions can be attributed to the town. Captain Rezendes, for a time, had the authority to verify the credentials of prospective officers, including the defendant Pearson. Finally, and perhaps most important, Police Chief Hunter appears to have been entrusted with plenary authority over most police department practices, including the training of personnel and the conduct of specific cases. His role is defined not simply by his day-to-day management of the police force but also by his authority under a state statute which authorizes local governments to delegate policymaking authority to chiefs of police. M.G.L. c. 41, § 97A (text at n. 10 *ante*). The significance of state law in deciding whether an employee establishes "official policy" has been recognized by an apparent majority of the Supreme Court, *see Pembaur, supra,* at 1300–01; *id.* at 1304 (O'Connor, J., concurring in part and concurring in the judgment), and by the First Circuit. See *Small, supra,* at 552–553.

Given these considerations, the specific individuals mentioned could plausibly be said to establish through their acts an offi-

---

**16.** Deriving a municipal policy from the acts of certain employees is not equivalent to *respondeat superior* liability. Inanimate entities, like towns, can act only through the individuals working for them. *See Bennett v. Slidell,* 5 Cir.1984, 728 F.2d 762, 771–72 (en banc) (Politz, J. dissenting), *cert. denied,* 1985, — U.S. —, 105 S.Ct. 3476, 87 L.Ed.2d 612. If the action of no employee could be considered, then no policy at all could be identified and scrutinized.

Therefore, the relevant question is whose acts should be deemed to give rise to official policies, and whose acts could give rise only to vicarious liability. The limited decision in *Tuttle* held that the act of a low level employee, however serious, did not warrant an inference of a municipal policy; it did not question that the acts of certain managerial employees could establish an official policy.

cial policy, thus making summary judgment on that issue inappropriate. *See, e.g., Wellington v. Daniels,* 4 Cir.1983, 717 F.2d 932, 936 ("Since Chief Austin is responsible for the choice and implementation of police department practices and procedures, his acts and omissions reflect government policy"); *Black v. Stephens,* 3 Cir.1981, 662 F.2d 181, 191 (police chief "wrote and implemented an official police regulation concerning disciplinary hearings ... [and] is the final authority in charge of the police force ...").[17] The decision in *Pembaur* is not to the contrary. In fact, it supports the view that the decisions, or single decision, of an individual may constitute official policy as long as that person is an official policymaker.

Finally, it should be noted that the Massachusetts statute cited *ante* does not confer unreviewable authority on the police chief: the chief is authorized "from time to time to make suitable regulations governing the police department, and the officers thereof, *subject to the approval of the selectmen*". M.G.L. c. 41, § 97A (emphasis added). Whether that reviewing authority is real, and thus whether Chief Hunter's discretionary authority makes him the "ultimate repository of ... power", are questions that have not been addressed with sufficient certainty by the parties or in the record. Cf. *Voutour v. Vitale, supra,* at 823 (municipal liability conditioned on town manager's knowledge of inadequate policy). The court is ruling at this juncture on a motion for summary judgment, not on the merits.[18]

### B.  *Official Policies*

To conclude that the acts of certain individuals may have given rise to an official policy is not, without more, sufficient to make the policy actionable under Section 1983. In addition to discovering who made a municipal policy (i.e., whose acts made it "official"), the Supreme Court has wrestled with the question of what is needed to constitute a "policy".

The Supreme Court has identified certain actions that plainly satisfy the "policy" requirement yet, as with the issue of who qualifies as an official policymaker, it has left the boundaries rather imprecise. *Monell,* for example, involved "formal, written policies of a municipal department ..." regarding maternity leaves, and was "the clear case". *Monell, supra,* 436 U.S. at 713, 98 S.Ct. at 2047 (Powell, J., concurring). This result follows naturally from the wording of Section 1983, which is directed at deprivation of rights "under color of any statute, ordinance, [or] regulation...." Thus, the type or form of action taken may determine whether it establishes an official policy.

In recent decisions several justices have moved toward a qualitative definition of "official policy", focusing on the nature of the decisions or actions taken as well as the category to which they belong. The plurality in *Pembaur, supra,* 106 S.Ct. at 1300, concluded "that municipal liability ... attaches where—and only where—*a deliberate choice to follow a course of action is made from among various alternatives* by the official or officials respon-

---

**17.** The obvious effect of finding that Police Chief Hunter is an official policymaker is to open the way for Nantucket's liability in many cases, since every policy decision of the chief would be attributed to the town. The extent of this liability may appear too far-reaching but, in fact, it is not. Expansive liability is due to the town's apparent decision to delegate policymaking authority to the police chief. The town need not have conferred so much power over its policy to him and could have established a separate mechanism for supervising law enforcement. Once it has made its delegation, however, the town cannot then disclaim the result-

ing liability. *See Williams v. Butler,* 8 Cir.1984, 746 F.2d 431, 439, *aff'd on rehearing,* 8 Cir.1985, 762 F.2d 73 (en banc).

**18.** The court also does not reach the question of whether an "official policy" is created when a policymaker's authority is *de facto* final but not "ultimate", or unreviewable, under state or local law. *See Bennett v. City of Slidell, supra,* at 773 (Politz, J., dissenting). To the extent the issue of "final authority" is one of fact and not strictly one of local or state law, the record is too sparse to support a definite resolution at present. *Cf. Williams v. Butler, supra,* at 440.

sible for establishing final policy ..." (emphasis added). Similarly in *Tuttle, supra,* 105 S.Ct. at 2436, another plurality wrote that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives...." The obvious tendency of these formulations, endorsed by what amounts to a majority of the justices, is to treat as actionable under Section 1983 only those policies made up of specific, concrete actions taken with some thought.

While this view is consistent with the Court's policy of carefully limiting liability to a municipality's "own", and actual, misconduct, it is at odds with another theme of Supreme Court analysis: that the term "policy" is not restricted to formal or elaborate plans and declarations.

> [A]lthough the touchstone of the § 1983 action ... is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments ... by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels. *Monell, supra,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36.

This result appears unavoidable given the statute's unambiguous reference to actions taken "under color of ... custom or usage"; and as the plurality in *Tuttle, supra,* 105 S.Ct. at 2432, observed, statutory construction must be undertaken "with the Act's precise language in mind."

▮ These two lines of analysis—one calling for a conscious or deliberate choice, the other permitting an unstated or customary practice—are not necessarily incompatible. They can be reconciled by ensuring that the "custom or usage" is unambiguously established by official policymakers' conduct and is not simply suggested by isolated actions of some employees.[19] *See Adickes v. S.H. Kress & Co.,* 1970, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 42 (cited in *Monell* ). Something more than creative inference is required.

A "custom or usage" of *inaction* by official policymakers, as opposed to a practice created by their affirmative acts, poses an especially acute problem. See *Turpin v. Mailet, supra,* at 200–01. As discussed *ante,* recent decisions of the Supreme Court indicate that a policy is not actionable under Section 1983 unless it has an element of deliberation or consciousness; what this means in the case of inaction is not exactly clear. The First Circuit has suggested a resolution of the problem by imposing liability only when official policymakers "knew or should have known that the [town employee] was not" acting in the proper manner "and then failed to take reasonable measures to rectify the situation." *Voutour v. Vitale, supra,* at 823. Though not offered with precisely this issue in mind, the Circuit Court's formulation is applicable to the present discussion. The reference to the "should have known" situation is significant, for it approximates the Supreme Court's requirement of deliberation without allowing municipalities and their official policymakers to shield themselves from liability through a policy of complete indifference to police matters.[20] In sum, there are a range of actions or even "inactions" that may comprise a policy actionable under Section 1983, yet they must be scrutinized to ensure that they

---

19. Thus, simple inaction by town officials regarding police matters, reflected in its delegation of authority to a police chief, is not enough to give rise to a "policy" and consequent liability under Section 1983. It is not inaction by the town but, rather, the decisions made by its individual policymakers, i.e., actual municipal policies, that give rise to liability. See *Williams v. Butler, supra,* at 438.

20. That a town "should have known" of its deficient policy may not, in itself, demonstrate "deliberation", but deliberation can be inferred where the importance of the policy or risks to the public are sufficiently obvious and substantial that an appropriate policy is a virtual necessity.

satisfy the Supreme Court's increasingly stiff requirements.

### 1. The Town's Failure to Train its Officers

■ In the present case, there are two official policies that arguably give rise to liability and must be considered in this motion. First, there is the town's failure to train its police officers, including defendant Pearson, properly, a policy which can be attributed to the town through the inaction of Police Chief Hunter or possibly through the deliberate avoidance of training by other official policymakers (e.g., the town selectmen involved in screening Officer Pearson's application). It is alleged, as described *ante*, that Hunter failed to establish any guidelines or training procedures for officers conducting criminal investigations. As the primary, if not exclusive, policymaker for the town on such matters, it can reasonably be inferred that no policies regarding police training were developed in another department or by other persons in local government. Defendants have not adduced any evidence to that effect. Construing all the evidence favorably to plaintiff, the court finds that a policy of not training its officers may very well have been established by the town. At least, there is a genuine issue as to the existence of such a policy, precluding summary judgment on this aspect of the case.

The existence of a policy, however, does not conclude the court's analysis. With a constitutional tort, as with a tort at common law, there remain questions as to the relevant standard of care and causation. *See LeBoeuf v. Ramsey*, D.Mass.1980, 503 F.Supp. 747, 757–58, *rev'd on other grounds sub nom., Costa v. Markey*, 1

Cir.1983, 706 F.2d 1 (en banc).[21] Regarding the standard of care, the First Circuit has stated that a plaintiff must show that a municipal defendant was "grossly negligent to the point of recklessness or deliberate indifference in failing to establish an appropriate custom or policy...." *Williams v. City of Boston*, 1 Cir.1986, 784 F.2d 430, 434–35; *Voutour v. Vitale, supra*, at 823.[22] In this case, the plaintiff has adduced evidence suggesting the complete absence of adequate training or guidelines for investigations and arrests. If proven, this inaction would arguably amount to gross negligence. In fact, it may be difficult for a jury to regard that policy as reasonable when citizens' reputations and even lives could be at risk. This conclusion is buttressed by decisions of the First Circuit, in which the court declined to overturn verdicts against defendants for a policy of inadequate training, *e.g., Wierstak v. Heffernan*, 1 Cir.1986, 789 F.2d 968, 974–75; *Kibbe v. City of Springfield*, 1 Cir.1985, 777 F.2d 801, 807–09, *cert. granted*, 1986, — U.S. —, 106 S.Ct. 1374, 89 L.Ed.2d 600, and declined to reverse the lower court's denial of summary judgment. *Voutour v. Vitale, supra*, at 820–23. Similarly in this case, plaintiff has adduced sufficient evidence to raise a genuine issue as to whether the town was "grossly negligent" in its training procedure.

Lastly, the issue of legal causation, though crucial to the case against the town, does not require elaborate discussion at present. It is sufficient to point out that the Supreme Court, in its reliance on such formulae as "moving force" and "affirmative link", is very sensitive to the requirement of proving a "causal link" between

**21.** The relatively elaborate showing of an "official policy", in contrast to the common law requirements, is distinctive to constitutional tort actions under Section 1983, and is itself only a gloss on the language of that statute. The "policy" requirement does not stand in isolation, however. Its formal elements seem designed to tighten the requirements for showing causation. *See Tuttle, supra,* 105 S.Ct. at 4643 (plurality). Though formally separate elements of a Section

1983 action, proof as to the chain of causation and as to the existence of a policy overlap.

**22.** Like the element of causation, discussed *ante* at n. 21, the standard of care overlaps with the elements of an "official policy". The Supreme Court's requirement of a "deliberate" choice of policy, discussed *ante,* is not unlike the insistence of the Court of Appeals on "deliberate indifference".

the town's policy and the alleged deprivation. *See, e.g., Tuttle, supra,* 105 S.Ct. at 2436–37 (plurality). Moreover, a plurality of the Court has expressly questioned whether the failure to train can constitute a policy that actually caused a constitutional violation. *Tuttle, supra,* at 2436 n. 7. It did not reach that question, however, and this court therefore follows the rulings of the First Circuit, cited *ante*, recognizing the proferred theory of liability.

### 2. *The Town's Policy Toward the Plaintiff*

The second policy for which the town may be liable—Police Chief Hunter's alleged authorization of the plaintiff's arrest (either directly or by implication)—is more problematic than the policy of inadequate training. The decision in *Pembaur* appears to allow for the town's liability on the basis of such a narrowly defined and focused action. In permitting municipal liability for improper service of a subpoena on a single person, six justices concluded that "a government frequently chooses a course of action tailored to a particular situation.... If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy'...." *Pembaur, supra,* 106 S.Ct. at 1299. Some lower courts appear to agree that action directed at a single person is a sufficient basis for municipal liability. *Compare Thomas v. Sams,* 5 Cir.1984, 734 F.2d 185, 193 (town may be liable for single individual's arrest); *Turpin v. Mailet, supra,* at 201 (same) *with Berry v. McLemore,* 5 Cir.1982, 670 F.2d 30, 32–33 (excessive force in one instance does not give rise to municipal liability).

While this view is not inconsistent with evolving legal rules, it gives rise to serious concerns. First, liability for such narrowly directed action could expand liability far beyond its present, somewhat imprecise confines; the requirement of conscious or deliberate choice would provide only a limited check. Second, liability would be attributed to the town for a policy that, in itself, was unconstitutional, and not simply for a policy that *resulted* in violation of rights. Courts should hesitate before imputing such violation to municipalities led by officials sworn to uphold constitutional rights. *See Pembaur, supra,* 106 S.Ct. at 1301 (White, J., concurring); *Monroe v. Pape, supra,* 365 U.S. at 235–39, 81 S.Ct. at 510–12 (Frankfurter, J., dissenting).

Finally, it is highly debatable whether conduct targetted at a single person should be regarded as a "policy" for purposes of Section 1983. Although the Supreme Court did not accept the position that "ad hoc" decisions, as opposed to comprehensive policies, were not actionable under Section 1983, *see Pembaur, supra,* 106 S.Ct. at 1309 (Powell, J., dissenting), there may be a ground somewhere in between the majority and dissent where certain actions are too random or selective to rise to the level of a policy and warrant municipal liability. Despite the significance of this question, it need not be decided at this time. In view of the denial of summary judgment with respect to the town's alleged policy of improper training, the court reserves the question until it is squarely presented or controlling law becomes more precise.

### V. *Conclusion*

For the foregoing reasons, the court denies the motions of defendants Pearson, Hunter, and the Town of Nantucket for summary judgment.