# United States Court of Appeals
## For the First Circuit

Nos. 19-2119
    19-2129

ROBERTO RAMOS PEREA,

Plaintiff, Appellee/Cross Appellant,

BEATRIZ LAGUERRE SAAVEDRA; BEATRIZ ALEXIA ALVAREZ LAGUERRE;
RAFAEL ENRIQUE ALVAREZ LAGUERRE; GABRIEL ORTIZ LAGUERRE; FABIAN
ANTONIO CHARRON ALVAREZ; CARLA VICTORIA CHARRON ALVAREZ,

Plaintiffs, Appellees,

v.

EDITORIAL CULTURAL, INC.,

Defendant, Appellant/Cross Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro Delgado-Hernández, U.S. District Judge]
[Hon. Marcos E. López, U.S. Magistrate Judge]

---

Before

Thompson and Lipez, Circuit Judges,
and Laplante,* District Judge.

---

Luz Yanix Vargas-Pérez, with whom Manuel Porro-Vizcarra was
on brief, for appellant and cross-appellee Editorial Cultural,
Inc.
José A. Hernández Mayoral, for appellee and cross-appellant
Roberto Ramos Perea.

---

* Of the District of New Hampshire, sitting by designation.

Patricia Rivera MacMurray, for appellees Beatriz Laguerre Saavedra, Beatriz Alexia Álvarez Laguerre, Rafael Enrique Álvarez Laguerre, Gabriel Ortiz Laguerre, Fabián Antonio Charrón Álvarez, and Carla Victoria Charrón Álvarez.

_____

September 13, 2021

_____

**Thompson**, **Circuit Judge**.  In these cross-appeals the issue we must resolve is whether a publishing company, Editorial Cultural, Inc. ("Editorial" or "Editorial Cultural"), is liable for copyright infringement after it printed and sold 20,000 copies of the theatrical adaptations of two novels -- La Llamarada and La Resaca -- ("the Adaptations") written by prominent Puerto Rico author Enrique Laguerre.  But first, we must resolve the determinative question:  which party owns the publishing rights to the Adaptations.  At the outset of this case, Laguerre's heirs and Roberto Ramos Perea (the playwright who adapted each novel for the stage) joined forces to sue Editorial Cultural.  What followed was litigation which took a twisted course towards final resolution before landing here.  Early on, the district court eliminated the playwright as the copyright owner and, following a jury trial, entered a judgment against Editorial Cultural awarding damages to Laguerre's heirs.  For reasons explained below, we vacate the Opinion and Order entered on September 30, 2017, and part of the amended judgment entered on September 19, 2019, and we direct the entry of an amended judgment in favor of Ramos[1] on his claim of

---

[1] We refer to the playwright by his first surname because, "[p]er 'Spanish naming conventions, if a person has two surnames, the first (which is the father's last name) is primary and the second (which is the mother's maiden name) is subordinate.'" United States v. Maldonado-Peña, 4 F.4th 1, 9 n.15 (1st Cir. 2021) (quoting United States v. Martínez-Benítez, 914 F.3d 1, 2 n.1 (1st Cir. 2019)).

- 3 -

copyright infringement.

I.   **Background**

        A.   Facts

        Enrique Laguerre published the novel La Llamarada in 1934 and the novel La Resaca in 1949.  In September 2001, Laguerre and Producciones Teatro Caribeño, Inc. ("Caribeño") entered into a contract which expressly authorized Ramos (who was not a party to the contract) to create "an adaptation . . . for theatrical presentation" of La Resaca and allowed Ramos to retain the moral rights[2] to this adaptation.[3]  The agreement authorized Caribeño to stage the theatrical adaptation in Puerto Rico at any time over the next four years.  The agreement also specified that Laguerre

---

[2] "In Puerto Rico, [an] intellectual property right is composed of two rights:  a moral right that protects the link between the author and her work, and a patrimonial right that grants her a monopoly over the exploitation of the work." Venegas Hernández v. Peer Int'l Corp., 270 F. Supp. 2d 207, 213 (D.P.R. 2003) (citation omitted).

> The patrimonial right is defined as the right to, *inter alia,* reproduce and perform the work, as well as the right to create derivative works, and to receive benefits derived from these acts.  The moral right protects the right to attribution of the work and the right to demand and protect the integrity of the work. This includes the right to prevent the alteration, truncation, and distortion of the work.

Id.

[3] Strangely, the record is silent on Caribeño's legal relationship, if any, to Ramos as we'll further discuss later on in our analysis.

retained the exclusive right to print the play scripts. Ramos completed the adaptation of La Resaca the same year. On April 29, 2003, Laguerre and Caribeño signed an addendum extending the term of the original contract until 2010. On this same day, Laguerre and Caribeño entered into a similar agreement authorizing Ramos to create an "adaptation . . . for theatrical representation" of La Llamarada. Again, Ramos, a non-party, retained the moral rights, and Laguerre retained the printing rights, to the adaptation. Ramos completed the adaptation of La Llamarada the same year. He registered copyrights for the Adaptations in 2015.

Meanwhile, in January 2002, Laguerre entered into a contract with Editorial Cultural purportedly giving it the right to print "one edition" of "the dramatic adaptation of . . . La Resaca" for seven consecutive years from the first printing date. Then on April 29, 2003, Laguerre, on the same day he contracted with Caribeño, entered into an agreement with Editorial Cultural which, again, purportedly gave Editorial the right to print up to 25,000 copies of La Llamarada in exchange for royalties. According to Editorial, both agreements were intended to provide it with the exclusive right to publish the Adaptations of La Llamarada and La Resaca (even though the agreement about printing La Llamarada did not specifically mention the theatrical adaptation).

Laguerre died in June 2005. Editorial Cultural published print versions of the Adaptations a few times, most

recently -- and most relevant for this litigation -- in 2013, after receiving a purchase order from Puerto Rico's Department of Education.

B.   Procedural History

In 2015, Ramos and Laguerre's daughter, Beatriz Laguerre Saavedra, initiated this suit against Editorial Cultural, their complaint evolving over a few iterations.  The Corrected Second Amended Complaint was filed by Ramos and Laguerre's other heirs,[4] who had been joined as plaintiffs.  The plaintiffs alleged Ramos owned the copyrights to both Adaptations and claimed Editorial infringed the copyrights when it printed and sold the publications to the Puerto Rico Department of Education in 2013.[5]  In Editorial's

_____

[4] Laguerre's other heirs are Beatriz Alexia Álvarez Laguerre, Rafael Enrique Álvarez Laguerre, Gabriel Ortiz Laguerre, Fabián Antonio Charrón Álvarez, and Carla Victoria Charrón Álvarez.

[5] The Corrected Second Amended Complaint included two other counts; one claim requesting cancellation of the 2010 copyright registrations Editorial Cultural had filed for revised editions of each novel completed by Laguerre prior to the theatrical adaptations, and one claim for an accounting of Editorial Cultural's sales of each novel.  Editorial Cultural responded with a counterclaim for unjust enrichment and fraud, alleging Laguerre knew his works were in the public domain when he entered into the publishing contracts with Editorial Cultural in 2002 and 2003.  By the time the district court entered final judgment, the parties had settled the cancellation of copyright claim, the district court had dismissed the accounting claim and the unjust enrichment counterclaim on the plaintiffs' and Editorial's respective motions, and a jury found for the plaintiffs on Editorial's fraud counterclaim.  None of these claims are a subject of the cross-appeals before us or have any bearing on Ramos's copyright infringement claim.

answer, it admitted Ramos held the Adaptations' moral copyrights but "affirmatively alleg[ed]" Laguerre "reserved" the publication rights.

Both sides moved for partial summary judgment on the infringement claim. In its motion, Editorial Cultural repeated its assertion that, pursuant to the Laguerre-Caribeño contracts, Laguerre reserved the printing rights to the Adaptations to himself exclusively, and Ramos was therefore not entitled to damages for infringement.[6] The plaintiffs claimed that Ramos owned the copyrights over the Adaptations, and thus was entitled to recover for infringement because 1) Laguerre authorized Ramos to create the Adaptations, therefore those creative works belonged to him, or, alternatively, 2) La Resaca and La Llamarada were in the public domain when the Adaptations were written (meaning they were available for public use) and as such Laguerre's authorization was not required.[7]

---

[6] Editorial Cultural was also moving for summary judgment on the plaintiffs' accounting claim, arguing its 2002 and 2003 contracts with Laguerre for printing the works were null and void because each novel was in the public domain at the time the contracts were formed. The district court denied this part of Editorial's motion, concluding the court did not have sufficient information from which to consider entering judgment as a matter of law on this claim.

[7] The plaintiffs also moved for summary judgment on Editorial Cultural's two counterclaims, arguing Editorial's counterclaim for deceit or fraud was barred by the applicable statute of limitations and its counterclaim for unjust enrichment was not available to the defendant as a distinct claim because this claim was simply

- 7 -

In granting Editorial's summary judgment motion on Ramos's infringement claim, the district court's ruling relied exclusively on the language of the Laguerre-Caribeño contracts and did not directly address the legal status of Laguerre's original novels at the time the contracts were signed.[8]  In so relying, the court concluded the Laguerre-Caribeño contracts unequivocally demonstrated Ramos was not the owner of the right to publish the theatrical adaptations he'd created because Laguerre had expressly retained this right in his contract with Caribeño:

> If Ramos-Perea had any right over printouts of [the] adaptations, he would prevail in case of infringement. But the agreements authorizing him to prepare theatrical adaptations for stage performance grant him rights over the theatrical representations, not the right to authorize printouts of the adaptations, which corresponds to Laguerre.  That being so, it was up to Laguerre, not Ramos-Perea, to authorize the sale of the theatrical adaptations.

Following summary judgment, some additional procedural wrangling ensued and eventually a third amended complaint was filed.  In it, the plaintiffs added an allegation that in addition to Ramos not authorizing the 2013 printing of the Adaptations

---

repackaging the claim for deceit.  The district court denied the plaintiffs' motion for partial summary judgment in its entirety, concluding (as it had with the accounting claim) that the record was insufficiently developed to permit judgment to enter on these counterclaims.

[8] The court acknowledged the parties had made arguments about the novels being in the public domain but, when it addressed one of Editorial Cultural's counterclaims, concluded it could not resolve this question based on the record before it.

neither had Laguerre or the Laguerre heirs.  And it repeated the allegation that Ramos owned the copyrights over the Adaptations.[9] The third amended complaint also acknowledged the district court's summary judgment conclusion that, based on the Laguerre-Caribeño contracts, Laguerre had the sole authority to allow the publication and sale of the Adaptations but, nonetheless, the pleading continued to allege that Editorial Cultural had engaged in copyright infringement in 2013 pursuant to 17 U.S.C. § 106.

Although this third amended complaint did not explicitly substitute Laguerre's heirs for Ramos as the alleged owners of the Adaptations' copyrights, the heirs did contend they owned the copyrights to Laguerre's original and revised works because, as his testate heirs, they had ownership rights to these works.  Based on the district court's summary judgment finding, Laguerre's heirs took up the mantle of the infringement claim and brought it to a jury to decide who owned the patrimonial right to the Adaptations and whether Editorial Cultural had infringed this right when it printed and sold the Adaptations to the Department of Education in 2013.  After a three-day trial held in February 2019, a jury returned a verdict for the heirs and against Editorial on the

_____

[9] The plaintiffs dropped a footnote in this third amended complaint that its allegations with respect to Ramos remained in the pleading to preserve his right to appeal the court's order granting summary judgment in Editorial Cultural's favor on his copyright infringement claim.  As we'll explain later, this was not necessary.

infringement claim and awarded them damages in the amount of $266,350.[10]

A couple of days later, Editorial Cultural renewed its Rule 50 motion for judgment as a matter of law (originally argued at the close of the Laguerre heirs' case but held in abeyance) primarily asserting that Laguerre's heirs had failed to introduce sufficient evidence at trial to demonstrate that Laguerre transferred the right to publish the Adaptations to them. Convinced by Editorial's argument the district court granted Editorial's motion and vacated the jury verdict as to the heirs' copyright infringement claim. Down but not out, Laguerre's heirs filed a Rule 59(e) motion to alter or amend the judgment, which caused the court to rethink its ruling. Concluding Editorial's argument that Laguerre could have bequeathed the printing rights to someone other than the Laguerre heirs should have been raised at trial and thus was waived, the district court granted the

---

[10] Federal Rule of Civil Procedure 15(b)(2) tells us that an "issue not raised by the pleadings [but] tried by the parties' express or implied consent . . . must be treated in all respects as if raised in the pleadings." While there is no explicit allegation in the third amended complaint -- the operative pleading at trial -- that Laguerre's heirs owned the copyrights to the theatrical adaptations, the parties clearly tried the copyright infringement claim based on the heirs claiming ownership and the verdict form expressly asked the jury to decide whether the heirs were the owners of the right to publish the adaptations.

plaintiffs' motion and reinstated the jury verdict.[11]  These cross-appeals followed.

Before us, Editorial Cultural challenges the district court's order granting the Laguerre heirs' Rule 59(e) motion reinstating the infringement verdict.  For his part, Ramos challenges the district court's order granting summary judgment to Editorial on his copyright infringement claim.  The determinative question in these cross-appeals continues to be which party owned the publishing rights to the Adaptations when Editorial Cultural sold them to the Department of Education in 2013.  To find the answer, we take a fresh look at the parties' cross-motions for partial summary judgment and the exhibits each submitted to support their respective positions.

## II.  **Standard of Review**

"We review an order granting summary judgment de novo." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018) (citing DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)). "A court may grant summary judgment only if the record, construed in the light most amiable to the nonmovant, presents no 'genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'"  Id. (quoting McKenney v.

---

[11] The court also rejected Editorial's claim that the verdict form should have required specific findings as to each plaintiff, concluding that, too, should have been raised at trial.

Mangino, 873 F.3d 75, 80 (1st Cir. 2017); then citing Fed. R. Civ. P. 56(a)). "Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007). This standard also remains in place when we review a summary judgment decision after a trial occurred on the remaining issues. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 61-62 (1st Cir. 2000) (reviewing summary judgment rulings de novo in a copyright infringement case in which trial issues had also been appealed).

## III. **Discussion**

Before us, Ramos argues primarily (as he did below) that he owns the full copyrights to the Adaptations because both of Laguerre's novels were in the public domain when he created the theatrical adaptations and, because the district court failed to take the public domain status of each work into account when it considered its summary judgment ruling, it erred. Ramos further claims the district court was wrong to premise its findings on the plain language of the Laguerre-Caribeño contracts because, according to Ramos, they neither show nor support the court's finding that he transferred his patrimonial copyright interests to Laguerre. In consequence of these errors, the court was wrong not to conclude, as a matter of law, that Ramos owned the copyrights to the Adaptations, including the right to print and distribute

- 12 -

them.[12],[13]

Curiously, Editorial Cultural first responds that we should not seriously consider Ramos's arguments at all. If Ramos truly believed he was the owner, then, according to Editorial, he "should have insisted on an expedited appellate review." By not requesting entry of final judgment on his infringement claim immediately after his summary judgment loss, Editorial contends Ramos waived appellate review of his claims.

Regarding Editorial Cultural's retort, it is clear to us Editorial is forgetting that we rarely allow interlocutory appeals. While Ramos could have sought an entry of partial judgment under civil procedure rule 54(b), he was not required to do so in order to preserve his appellate claims. Indeed, we have long discouraged "piecemeal appellate review[,] . . . warn[ing] time and again[] that Rule 54(b) should be used sparingly."

---

[12] Alternatively, we understand Ramos to be arguing that Laguerre's contracts with Caribeño were unenforceable because Laguerre did not own the copyrights of the novels at the time he signed these contracts purporting to give his authorization to write, produce, and print the Adaptations.

[13] Helpfully, Laguerre's heirs conceded during oral argument before us that Ramos is the rightful owner of the full copyrights to the Adaptations. They stated that Ramos, as the true owner, should win this case and that they would accept the court's reversal of the summary judgment order. During oral argument, Laguerre's heirs were clear that they took up the claim of ownership for purposes of the copyright infringement claim only after the district court issued its decision on the cross-motions for partial summary judgment concluding Laguerre had effectively reserved the printing rights to the Adaptations.

<u>Nichols</u> v. <u>Cadle Co.</u>, 101 F.3d 1448, 1449 (1st Cir. 1996); <u>see</u> <u>also</u> <u>Estate of Barrett</u> v. <u>United States</u>, 462 F.3d 28, 32 (1st Cir. 2006) (a district court's decision disposing of some but not all claims is usually not an appealable judgment unless partial judgment is certified under Rule 54(b)). We have also previously noted that "[w]e are perfectly capable of reviewing a pretrial grant of partial summary judgment after a full trial on the merits of the remaining issues." <u>Mandel</u> v. <u>Bos. Phoenix, Inc.</u>, 456 F.3d 198, 204 n.2 (1st Cir. 2006) (citing <u>Voutour</u> v. <u>Vitale</u>, 761 F.2d 812, 817 (1st Cir. 1985) (per curiam)).[14]

Editorial Cultural also complains here about what the plaintiffs alleged and argued after the district court decided the cross-motions for summary judgment, criticizing them for shifting legal positions after the district court issued its decision (i.e., claiming they owned the copyrights to the Adaptations rather than Ramos).[15] But at this stage of our discussion what happened after

_____

[14] One more thing: we note Editorial Cultural appears to concede that its waiver argument is not a winning one; it wrote in the concluding paragraph of its reply brief that "regardless of the fact that the district court did not enter judgment on the dismissal of Ramos Perea's cause of action, and thus, the issue remained open for review as the case continued towards trial with the remaining parties, . . . ."

[15] Editorial Cultural spilled significant ink comparing Ramos's appellate arguments to those from Laguerre's heirs, pointing out the contradictions in their positions. Given Laguerre's heirs' concession, we need not address Editorial Cultural's concerns. We simply note that Ramos's appellate arguments were clearly focused on the case as it stood at the

- 14 -

summary judgment is unimportant since we are laser-focused on the summary judgment record and the arguments based thereon. And as we explain below, we conclude the record at the time the district court ruled on the cross-motions undisputedly showed the public domain status of Laguerre's original works. Accordingly, the copyright owner of Ramos's theatrical adaptations should have been determined as a matter of law by appropriate reference to the statutes governing copyrights.[16]

We start then by laying out the essential legal principles that govern.

A.    Applicable copyright principles

Under the Copyright Act, "[c]opyright . . . vests initially in the author or authors of the work." 17 U.S.C. § 201(a). "The Act confers on a copyright owner certain exclusive rights, including the rights to reproduce and distribute the work and to develop and market derivative works." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 668 (2014) (citing 17 U.S.C. § 106). A derivative work is "a work based upon one or more preexisting works, such as a . . . dramatization . . . or any other

---

summary judgment stage of the litigation, and the heirs' arguments were clearly focused on what happened after the summary judgment motions in the time leading up to trial, during the trial itself, and litigating the posttrial motions.

[16] As a result, we will not need to reach whether the Laguerre-Caribeño contracts were enforceable.

form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Derivative works receive copyright protection to the extent the author of the derivative work contributed material to the new work as opposed to the material that existed in the original work. 17 U.S.C. § 103(b).

"The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law . . . ." 17 U.S.C. § 201(d)(1). Moreover, "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately." Id. § 201(d)(2). "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." Id. § 204(a).

"The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Id. § 501(b); see also Motta v. Samuel Weiser, Inc., 768 F.2d 481, 483-84 (1st Cir. 1985). "To establish copyright infringement, the plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Latin Am. Music Co. Inc. v. Media Power Grp., Inc., 705 F.3d 34, 38 (1st Cir. 2013)

- 16 -

(quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).

Works created before January 1, 1978 retained copyright protection for 28 years. See Stewart v. Abend, 495 U.S. 207, 212 (1990) (explaining that "[t]he Copyright Act of 1909 . . . provided authors a 28-year initial term of copyright protection" (citing 17 U.S.C. § 24 (1976 ed.)); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 9.08 n.13 (2021) (hereinafter Nimmer on Copyright) ("The courts . . . interpreted Section 24 of the 1909 Act as meaning that the first term expired 28 years from publication *or* registration, whichever first occurred." (emphasis in original) (citations omitted)); Shoptalk, Ltd. v. Concorde-New Horizons Corp., 168 F.3d 586, 587 (2d Cir. 1999) (finding that the 1909 Act "governs works published before 1978" (citation omitted)). Works whose initial term expired before January 1, 1978, were eligible for a renewal period of 28 years. See Nimmer on Copyright at § 9.08 (explaining that "the 1909 Act provided, upon satisfaction of the requisite procedures, for a renewal term . . . [of] 28 years" (footnote omitted)); see also Stewart, 495 U.S. at 212 (stating that the 1909 Act provided for "28-year renewal term" (citing 17 U.S.C. § 24 (1976 ed.)). "Once the copyright expires, the work enters the public domain and is freely subject to copying and performance without the owner's permission." Phoenix Entm't Partners v. Rumsey, 829 F.3d 817, 825

- 17 -

(7th Cir. 2016) (citing Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 33 (2003)); TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001); see also Golan v. Holder, 565 U.S. 302, 331-32 (2012) ("Once the term of protection ends, the works do not revest in any rightholder. Instead, the works simply lapse into the public domain. . . . Anyone has free access to the public domain, but no one, after the copyright term has expired, acquires ownership rights in the once-protected works."). "In the case of a derivative work based on an underlying work that is in the public domain, only the material added to the underlying work is protected by copyright." Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994) (citing 1 Nimmer on Copyright § 3.07[C]).

B.    The novels were in the public domain

To determine when Laguerre's novels passed into the public domain, we must simply do the math. From the exhibits submitted in support of the cross-motions for summary judgment, La Llamarada, as noted, was published in 1935 and La Resaca was published in 1949. Both works were governed by the 1909 Copyright Act and were therefore entitled to 28 years of copyright protection after publication, plus an additional 28 years if properly renewed. See Stewart, 495 U.S. at 212; Nimmer on Copyright, at § 9.08. A copyright for La Llamarada was registered in 1936, and the parties

- 18 -

agree that there is no evidence that the registration was renewed.[17]

Thus, the work passed into the public domain in 1964.  As for La

Resaca, this work may have always been in the public domain because

this novel was never registered in the Copyright Office.  Even if

we assume Laguerre had complied with the requirements in place at

the time to secure copyright protection, however, the novel would

have passed into the public domain by 1977.[18]  See Stewart, 495

U.S. at 212.  There is no doubt, therefore, that both novels were

in the public domain by 1977, a long time before Laguerre and

Caribeño purported to contract for the theatrical adaptation of

---

[17] Editorial Cultural submitted documents in support of its motion for summary judgment showing that the copyright registered to La Llamarada was not renewed or assigned.

[18] Editorial Cultural also submitted evidence that no copyright was ever registered as to La Resaca.  Under § 10 of the 1909 Copyright Act, however, a work could also receive copyright protection if it was published with the word "copyright" or the familiar "©", the name of the copyright owner, and the year of publication printed on the title page or the first page following the title page, or evidence of substantial compliance with this so-called "notice requirement."  Robert A. Gorman and Jane C. Ginsburg, Copyright: Cases and Materials 470 (Foundation Press 7th ed. 2006) (citing §§ 10, 19 of the 1909 Copyright Right Act); see also Brown v. Latin Am. Music Co., 498 F.3d 18, 23-24 (1st Cir. 2007).  The first edition of La Resaca shows "[r]ights reserved in accordance to law" printed within the first pages of the publication.  We need not decide whether this was substantial compliance with § 10 of the 1909 Act because, even if this statement did qualify as substantial compliance so that the novel was protected by the initial 28-year term of copyright protection, La Resaca was in the public domain long before any of the contracts or adaptations at issue here were under consideration.

each work in the early 2000s.[19]

When Ramos adapted the novels into the play scripts in 2001 and 2003, respectively, Laguerre had no copyright interest in either of these novels (or any work derived from them) and Ramos became the owner of the derivative works -- the Adaptations -- he created,[20] with the exclusive power to authorize the printing and sale of them. See Petrella, 572 U.S. at 668; 17 U.S.C. §§ 106, 201(a). As we discuss next, there is nothing in the summary judgment record to suggest Ramos transferred his ownership or any rights associated with this ownership (i.e., the printing rights) to any other party.

C.  Laguerre-Caribeño contracts

Ramos asserts that because Laguerre did not hold any rights over the two novels at issue when he signed the contracts with Caribeño, the documents had no legal effect because "Laguerre

_____

[19] Editorial Cultural also asserts, without clear explanation, that Ramos's argument on appeal that he is the true owner of the copyrights because the original works were in the public domain when Ramos adapted them would require "a giant leap of faith" on our part as well as some impermissible assumptions about why the jury found in favor of Laguerre's heirs. But as we've just explained, the summary judgment record and the plain language of the copyright statutes support Ramos's argument.

[20] The parties do not contest the status of the Adaptations as "derivative works" pursuant to 17 U.S.C. § 101; indeed, each acknowledges the Adaptations as derivative works.

- 20 -

was attempting to exercise rights he did not have."[21] Editorial Cultural responds by asserting that Ramos "voluntarily transferred the right to reproduce" the Adaptations to Laguerre via the Caribeño contracts, which were "instrument[s] of conveyance signed by [his] authorized agent . . . Caribeño." The problem with Editorial Cultural's take on this point is that the plain language of the contracts does not support its position.

Pursuant to Puerto Rico law, "where the terms of a contract are clear, leaving no doubt as to the contracting parties' intentions, such contract will be observed according to the literal sense of its stipulations." Almeida-León v. WM Cap. Mgmt., Inc., 993 F.3d 1, 12 (1st Cir. 2021) (quoting Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) which was quoting P.R. Laws Ann. tit. 31, § 3471) (internal quotation marks omitted). On the face of the documents, each Caribeño contract is between Laguerre and Caribeño. Ramos's name does appear twice in each document; first when Laguerre purports to authorize Ramos's creation of the Adaptations and second when Ramos is identified as having the moral rights over the Adaptations. But Ramos is not identified as a contracting party. Ramos is not a signatory to

---

[21] Editorial neither questions nor defends the district court's conclusions at summary judgment that these contracts governed the rights regarding the Adaptations, that the plain language meant Laguerre had authorized Ramos to write the Adaptations, and that Laguerre expressly retained the printing rights to those Adaptations.

the contract, in either a personal or representative capacity. And Caribeño is not identified as either Ramos's agent or in any other way legally related to Ramos. Moreover, Editorial Cultural does not point to any evidence in the record (summary judgment or otherwise) where any relationship between Caribeño and Ramos is fleshed out.[22] While the language in the contracts is clear with respect to Laguerre and Caribeño's intentions, the contracts are equally clear that Ramos had not authorized either contractual party to agree to any terms on his behalf. As a result, the Laguerre-Caribeño contracts have no legal effect on Ramos's status as owner of the copyrights over the theatrical adaptations he wrote.

### D. Infringement of the copyright

Having determined Ramos to be the true owner of the copyrights, we move on to the second prong of a claim for copyright infringement: "copying of constituent elements of the work that

---

[22] Editorial Cultural also argues that Ramos is "estopped" from asserting before us that he is the owner of the copyrights to the theatrical adaptations because he argued at summary judgment that he was the owner, then, in the post-summary judgment amended pleading, took the "contradictory position[]" that Laguerre owned these copyrights, "voluntarily decid[ing] to exchange hats with Laguerre's heirs for trial." Editorial doesn't elaborate this point, but we note that, contrary to Editorial's statement in its brief, Ramos did not affirmatively allege in the third amended complaint that the heirs were the owners of the copyrights to the Adaptations. There is no indication he switched his hat to Laguerre's heirs. We therefore disagree that Ramos is in any way estopped from his appellate arguments before us.

- 22 -

are original." Feist Publications, Inc., 499 U.S. at 363. "A plaintiff who owns a copyrighted work has the ultimate burden to prove that (1) the defendant 'actually copied the work as a factual matter' and (2) the 'copying . . . rendered the infringing and copyrighted works substantially similar.'" Cortés-Ramos v. Martín-Morales, 956 F.3d 36, 41 (1st Cir. 2020) (quoting T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 108 (1st Cir. 2006)).

Editorial Cultural's publication and sale of the Adaptations in 2013 was not in dispute at the time of summary judgment (or after). Editorial also does not contend that Ramos provided consent or authorization for the 2013 printings. (Instead it simply holds firm in its assertion, as we've previously noted, that Ramos's permission was not required because Editorial operated with contractual authorization from Laguerre.) Therefore, in conducting our de novo review we conclude that Editorial, in distributing Ramos's adaptations, is liable to him for copyright infringement.[23] See id.; 17 U.S.C. § 501.

---

[23] We pause here for a moment to acknowledge a development in the interpretation of the Copyright Act which occurred while this litigation was pending. 17 U.S.C. § 411 provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." The Copyright Office registered Ramos's copyrights to the theatrical adaptations on October 14, 2015, nine days after he initiated this cause of action. Ramos submitted copies of these certificates in support of the plaintiffs' partial motion for summary judgment. On March 4, 2019 (long after the district court resolved the cross-motions for summary judgment and almost a month after the jury

- 23 -

Regrettably, the district court's erroneous conclusion that Laguerre retained the right to print the Adaptations fundamentally altered the course of this case. Our decision today vacates the grant of summary judgment in Editorial Cultural's favor as against Ramos and we direct the entry of summary judgment for Ramos. Necessarily, we vacate the portion of the amended judgment finding in favor of the heirs on the copyright infringement claim and substitute Ramos as the prevailing plaintiff on that claim.[24]

---

rendered its verdict in this case), the Supreme Court issued an opinion holding, for the first time, "that registration occurs, and a copyright claimant may commence an infringement suit, when the Copyright Office registers a copyright," not when the application is filed. Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC, 139 S. Ct. 881, 886 (2019). This decision resolved a circuit split about "when registration occurs in accordance with § 411(a)." Id. at 887. Editorial Cultural did not raise a § 411 timing issue either before the district court or before us on appeal and, even if it had, Ramos would have been in the clear because, at the time he filed the initial complaint, "registration" pursuant to § 411 had not been definitely decided to mean the Copyright Office's registration of the copyright.

[24] Editorial Cultural raises several other arguments in its attempt to defeat Ramos's claim of copyright ownership, which we acknowledge but for various reasons find unpersuasive.

Editorial Cultural contends that Ramos, through his conduct, created an implied license allowing Editorial Cultural to print the Adaptations. The implied license of a copyright "may occur without any particular formality, as by conduct manifesting the owner's intent." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010) (citing John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003)). Editorial Cultural asserts that Ramos acknowledged the Laguerre-Caribeño contracts, paid royalties to Laguerre for the performances, acquiesced to Editorial Cultural's publication of the Adaptations, and knew about the contracts between Laguerre and Editorial Cultural. First, Editorial Cultural's assertions here are not supported by any of the evidence or documents on the record --

- 24 -

E.    Damages

The remedies for copyright infringement can take several different forms, including injunctions, impounding of the copied work, actual damages, and statutory damages.  17 U.S.C. §§ 502-505.  As we highlighted at the beginning of this opinion, a jury awarded $266,350 in monetary damages to Laguerre's heirs after it found them to be the owner of the right to publish the Adaptations and that Editorial Cultural infringed their right.  This award was

summary judgment or otherwise.  Second, while Editorial Cultural mentioned the implied license in its answer to the Corrected Second Amended Complaint, it did not make any argument on this point until a surreply to the cross-motions for summary judgment.  The district court did not address this argument and neither will we.  See Irizarry-Santiago v. Essilor Indus., 929 F. Supp. 2d 30, 32 n.4 (D.P.R. 2013) (citing D.R. Civ r. 7(c)) (arguments raised for the first time in a reply brief cannot be considered).

Editorial Cultural also suggests that because the respective lawyers who represent the Laguerre heirs and Ramos on appeal represented the plaintiffs together throughout the case in the district court, including the Laguerre heirs during trial, there is a conflict of interest.  However, Editorial Cultural fails to set forth the relevant law regarding conflicts of interest and does not adequately explain how this conflict exists and serves to prejudice it in its appeal before us.  We deem this argument waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that "issues . . . unaccompanied by some effort at developed argumentation[] are deemed waived").

Finally, Editorial Cultural suggests that Ramos is attempting to convince us that the jury's attribution of copyright ownership does not matter, a purported violation of due process because Editorial Cultural defended itself against the Laguerre heirs' claim to copyright ownership at trial.  Additionally, according to Editorial Cultural, by asking the court to transfer the judgment from the Laguerre heirs to him, Ramos is seeking to deprive the heirs of a jury verdict, which also violates due process.  This argument is only perfunctorily presented and, to the extent it is not mooted by Laguerre's heirs' concession that Ramos is the true owner of the full copyrights, the argument is waived.  See id.

clearly based on the purchase orders, invoices, and cancelled checks on the record, first introduced by Editorial itself in support of a second motion for summary judgment it filed prior to trial. Laguerre's heirs then entered these documents as trial exhibits.

Ramos states that this court need not set aside the damages calculated by the jury because this dollar figure was based on the calculation of revenue Editorial Cultural received when it sold the infringing works minus its expenses, and this net total remains the same regardless of the prevailing plaintiff in this case. Ramos argues Editorial is liable to him for this same amount and suggests we transfer the award in the same amount to him. Editorial does not provide us with a reason why the damages award could not be summarily transferred to Ramos. Indeed, Editorial has waived any dispute it has with the damages amount because it did not challenge the award figure before the trial court nor does it do so here before us. We affirm this award without remanding to the district court because Ramos -- seemingly satisfied with this award as his damages -- encourages us to do so, the uncontroverted record of Editorial Cultural's profit from the 2013 publication and sale of the theatrical adaptations is clear, and principles of judicial economy will not be served by remanding this case to the district court to determine damages. See Conde v. Starlight I, Inc., 103 F.3d 210, 215 n.6 (1st Cir. 1997)

- 26 -

(opting, "for reasons of judicial economy," to calculate loss figure using evidence that was before the jury); see also United States v. Scott, 270 F.3d 30, 57-58 (1st Cir. 2001) (determining the appropriate remedy for a Speedy Trial Act violation without remanding because to do so advanced "goals of judicial economy"); Free v. Landrieu, 666 F.2d 698, 702 n.9 (1st Cir. 1981) (declaring remand unnecessary for further development of record when no indication from the briefs that the factual underpinnings of issue were in dispute and when "time and money out of all proportion to the dollar amounts at stake" had been expended in the case which had little precedential value).

## IV. Conclusion

Ramos's appeal is sustained and Editorial Cultural's appeal is dismissed. We remand this case to the district court for entry of judgment consistent with this opinion. Costs to Ramos.